**ORIGINAL**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

----------------------------------------------X

CHRIS AGOLIATI,

      Plaintiff,

      V.

BLOCK 865 LOT 300 LLC

      Defendant,

And,

JOHN AND MARLA DIFORTE,

      Defendants,

And,

CARMEL MCCARTHY,

      Defendant,

And,

AVERY GROSS,

      Defendant.

----------------------------------------X

Docket No.

**CV 19-5477**

**KUNTZ, J.**

BLOOM, M.J.

RECEIVED
SEP 2 6 2019
PRO SE OFFICE

**JURY DEMAND**

## COMPLAINT

By and for his causes of action against each of the named defendants, Plaintiff Chris Agoliati states as follows:

1

## INTRODUCTION

1.      This case involves the deliberate and malicious theft of three interests in real property on Staten Island, from their rightful senior citizens owners through the use of fraud, breach of contract and conversion by the defendants and each of them.

## PARTIES

### The Plaintiffs

2.      Plaintiff, Chris Agoliati, has a residence at 30 Heritage Court, Towaco, NJ 07082.

### The Defendants

### The DCYF Defendants

3.      Defendant Block 865 Lot 300 LLC is a New York limited liability company which maintains an address for service at

4.      Defendants Marla and John DiForte are husband and wife and maintain a residence at 44 Hillview Place, Staten Island, NY 10304.

5.      Defendant Carmel McCarthy maintains a residence at 42 Hillview Place, Staten Island, NY 10304.

6.      Avery Gross is an attorney in New York who maintains a law practice and real estate development company from 30 Bay St., Staten Island, NY 10314.

## JURISDICTION

7.      This Court also has jurisdiction under 28 U.S.C. § 1332, as there is complete diversity of jurisdiction between the plaintiff and the Defendants and the amount in dispute exceeds $75,000.00.

8.      Venue as to each of the defendants is proper in this District pursuant to 28 U.S.C. Section 1391(b)(1) (as a judicial district where any defendant resides) and 28 U.S.C. Section 1391(b)(2) (a judicial district in which a substantial part of the events giving rise to the claim occurred).

2

## FACTUAL PREDICATE

9.      Block 865 Lot 300 is a property improved by a large, in-ground, concrete lined pool, in an upscale community on Staten Island.

10.     All property in or about Block 865 was at one time a farm owned by the Agoliati-Lavori family. As time passed this larger parcel was sub-divided and sold off. In 1958, Timothy and Genevieve Costello bought a portion of the property, and on one section built a large concrete-lined in-ground pool. This plot is now identified as Block 865, lot 300 (the "Pool Property").

11.     The property is improved by both an in-ground pool and a small pool house that has a certificate of occupancy as a single family home.

12.     In 1966, Costello and his wife broke this lot into 8 fractional interests, for the purpose of enabling each owner of an interest to share in the rights and use of the pool.

13.     From approximately 1966 through about 1992 the property was used as a pool.  The Pool has not been used in at least two decades, but the structure is intact, and can be repaired to render the pool useable.

14.     Between 1966 and the present, each of the original grantee parties in interest re-conveyed their respective fractional interests to others.

15.     Originally, going back as far as recollected memory brings us, the Pool Property was managed by Mary Lavori and her sister, Carmel McCarthy. In or about 1988, Carmel McCarthy was the Pool Property manager with her husband, Roger.  In 2012, Carmel McCarthy retired, and her daughter, Marla DiForte and her husband John DiForte took over management of the Pool Property.

16.     In their capacity as what will be referred to as, Pool Property managers, Mary Lavori and Carmel McCarthy acted as informal brokers bringing together owners who wanted to sell their interest in the Pool Property, with neighbors who wanted to buy.

17.     For example, the list of Pool Property owners sent out by Carmel McCarthy in 1988 list all owners at the time including, "Grigoli, Jerry and Diane" as owners and listing "DiForte, John & Marla" as "(new members)" and "Goldman, Mike and Terry" as "(*Available share)" "*by Wm Lavori". By providing thee lists to all Pool Property owners Carmel McCarthy kept track of the owners, and advised all other owners of the status of ownership changes.

18.     The list of Pool Property owners for the 1988/89 season included "Grigoli, Jerry and Diane" and "Piccone, Vincent and Colleen" Carmel McCarthy wrote:

> For the future, as pool shares become available, it would be an advantage to have a waiting list of potential purchasers. Think about having your friends or relatives become interested in sharing the pleasures of the pool; as owners.

4

19.     Throughout her tenure as Pool Manager, Carmel McCarthy wrote similar statements. In an August 15, 2010, letter to Jerry Grigoli regarding the payment for pool property expenses, Ms. McCarthy states:

> If you are not interested in you share, why don't you offer it to the other owners per the requirements in the deed!

20.     Jerry Grigoli, confirmed this description of Carmel McCarthy`s role during his testimony on this issue:

> Q.     You testified that in your words that Mrs. McCarthy ran the pool. Would you explain to us what you mean when you say she ran the pool?
>
> A.     Well, if the phrase "did everything" would suffice but I'll assume it won't. She sent out the notice for the dues. She collected the dues. **She organized the people who wanted to sell their shares and got people at some point or got help getting people who wanted to buy those shares or ownership**, et cetera. [emphasis added]

21.     After Carmel McCarthy and her family had managed the Pool property for more than three decades all other Pool Property owners knew the problem with unrecorded deeds and the title issues they raised. In an August 27, 1990, letter from Attorney Kuhn to Carmel McCarthy, he raises the point of the unrecorded deeds:

> As an incidental point, it would appear that two of the supposed owners have not recorded deeds. This should be taken of, if necessary by requesting the prior owners to execute new deeds.

22.     In a September 8, 2014, letter, even Defendant Attorney Gross recognized

this problem stating:

> The property was once divided into at least eight separate, undivided
> interests (and perhaps some of the portions into 1/16-ths). Some of the
> interests in the chain of title appear to be incomplete, either because
> parties are unknown, not locatable, or because deeds to certain
> fractional interests may have been lost or never recorded. Needless to
> say, no one ever had any title insurance.

23.     The property is currently valued at $518,000.00 dollars according to the RPT

forms filed with the Plaintiff LLC`s deeds.

24.     Defendant Attorney Gross has a financial interest in the Plaintiff LLC as he

himself has admitted.

25.     Attorney Gross's own comments describe the background of his

representation of Marla DiForte and the Plaintiff LLC:

> At that time, **in the early part of 2014**, prior to the commencement of
> this action, I was consulted by Marla DiForte, on behalf of the
> plaintiff company, and was requested to determine the identity of all
> true owners of record of all of the outstanding interest in the Block
> 865, Lot 300 property, so that she could attempt to negotiate, with the
> other verified owners of the various fractional interests in the
> property. **It was then her expressed intention to develop a mutually
> satisfactory arrangement for the joint development of the parcel .**
> . .

26.     Yet at all times since Defendant Attorney Avery Gross entered into an

agreement with the DiForte Defendants and Defendant Block 865 Lot 300 LLC

regarding the Pool Property, Defendant Attorney Avery Gross has lied, suborned perjury and otherwise hid his financial relationship with the Defendant LLC.

27.    Defendant Attorney Gross's actions, as an attorney representing the DiForte Defendants and the Defendant LLC are governed by the principles of agency law as well as by the law relating to attorney client relationships.

28.    By acting under the supervision of, and at the direction of, the DiForte Defendants and the Defendant LLC, all of Defendant Attorney Gross's actions are attributable to the other defendants and each of them.

29.    The Pool Property is of significant current value.  Over the years the escalation of real estate prices has had a positive effect on the land and houses around the Pool Property, such that the City of New York has appraised the land at $518,000.00  since approximately 2013, for real estate tax purposes. This means that each 1/8 interest in the Pool Property has a current value of approximately $64,750.00.

30.    In the late Spring and Early summer of 2014, Defendant Avery Gross on behalf of himself and the other defendants sent correspondence to all owners of ineterests in the Pool Property which made numerous false statements.

31.    In his correspondence with former owners of the Pool Property after he had received directions from Marla DiForte to consolidate all interest in the Pool Property, Avery Gross made the false statement that:

> I am the attorney for John and Marla DiForte, whose company holds the majority interest in property located on Hillview Place, in Block 865, the location of a certain defunct outdoor pool.

32.     Attorney Gross misrepresented that his client then owned "the majority interest in" the Pool Property. In fact, at best, the Plaintiff LLC only owned a 1/2 interest in the Pool Property at that time. By misrepresenting the amount of ownership interest held, Attorney Gross created the mistaken impression that as the majority owner, the defendants had control over what happened with the Pool Property.

33.     Moreover, John DiForte testified at his deposition, that Attorney Gross did not represent John DiForte with regard to the Pool Property and Marla DiForte was the only owner of the Plaintiff LLC. If at the time these letters were mailed, John DiForte or Avery Gross were also members of the Plaintiff LLC, then both John and Marla DiForte perjured themselves when they testified that Marla DiForte was the only owner.

34.     Attorney Gross sent June 25, 2014, letters containing this identical statement to Vincent and Colleen Piccone, Jerome Grigoli, Chris Agoliati, and Barbara and Leonard DuSold. Thus we know that Attorney Gross made these same false statements at least 4 times to each of these different recipients.

35.     But then in his September 8, 2014, letter to Lynne Miller, Attorney Gross changed what he was misrepresenting. In that letter he began:

> I presently represent Mr. and Mrs. John DiForte. The DiFortes are the owners of the majority interest in a certain vacant lot known as Block 865, Lot 300.

36.   Defendant Attorney Gross knew that in fact John and Marla DiForte had transferred any interest they had in the Pool Property to the Defendant LLC.

37.   In fact, Defendant Attorney Gross has misrepresented the nature of his relationship with both the DiForte Defendants and the Defendant LLC since 2014.

38.   Both Attorney Gross and Marla DiForte admit that there is no written retainer agreement. For example, during the framed issue hearing the following exchange took place:

> Q.   Mrs. DiForte, did your LLC have a retainer agreement with attorney Avery Gross?
> A.   No.
> Q.   None at all?
> A.   None.

39.   Yet New York law requires that an Attorney have a written retainer agreement with a client, in order to "ensure that there is a memorialized meeting of the minds with regard to the basic terms of the engagement". Part 1215 to Title 22 of the Official Compilations of Codes, Rules and Regulations of the State of New York, entitled "Written Letter of Engagement," states, as follows:

> §1215.1 Requirements
> Effective March 4, 2002, an attorney who undertakes to represent a client and enters into an arrangement for, charges or collects any fee from a client **shall provide to the client a written letter of engagement before** commencing the representation . . . .

9

40.   Yet Marla DiForte has testified several times that neither she nor the

Plaintiff LLC has any retainer with Attorney Gross, since 2014, through three

different real estate closings and four years of litigation in New York Supreme

Court.

41.   And there are many more additional troublesome facts regarding Attorney

Gross's representation of the Plaintiff LLC. During the framed issue hearing Marla

DiForte testified that she did not know how much her LLC had paid for the

Rothman to Plaintiff LLC Deed (June 11, 2018 Transcript, Page 473, lines 7-16),

nor did Ms. DiForte know how much her LLC paid for the DuSold to Plaintiff

LLC Deed (June 11, 2018 Transcript, Page 472, line 14, through Page 473, Line

6), nor what her LLC's attorney Avery Gross paid for the Miller to Plaintiff LLC

Deed (June 11, 2018 Transcript, Page 473, line 17, through Page 474, Line 3). Mrs.

DiForte answered the summation questions on these facts as follows:

> Q.   Are you telling us that you don't know how much Attorney
> Gross paid on behalf of your LLC for the DuSold Deed to LLC, the
> Rothman deed to the lLC, or the Lynn Miller deed to the LLC; is that
> correct?
> A.   That's correct.

42.   These are no small issues because the City of New York appraised the Pool

Property as worth 518,000.00 for real estate tax purposes.

> Q.   Are you aware of what the property is worth today?
> A.   No, I'm not.

Q.    Are you aware of what the City of New York appraises the property at?
A.    No.

43.    Ms. DiForte equivocal answers contradict her having signed the Real

Property Transfer Reports filed with the DuSold to Plaintiff, LLC deed, and again

with the Rothman to Plaintiff LLC deed, under penalty of perjury that the Pool

Property's "Total Assessed Value" was "518,000.00". Ms. DiForte also signed the

same form for submission with the Rothman to Plaintiff LLC deed also showing

the value of the property at $518,000.00. With each of the eight interests in the

Pool Property being valued at $64,750.00, Ms. DiForte's lack of knowledge about

how much she paid for three of those shares appears contrived.

44.    According to repeated statements like the one above, Attorney Gross was

only representing the Plaintiff LLC, yet in this letter there is no mention of the

Plaintiff LLC at all, and again, John Diforte has testified that Attorney Gross never

represented him with regard to the Pool Property.  Here again Attorney Gross

again misrepresents that the DiForte's own, instead of the Plaintiff LLC, owns a

majority interest in the Pool Property, when neither of the DiForte's own any

interest in the property any longer having already conveyed their interest to the

Plaintiff LLC and the Plaintiff LLC not owning a majority of the property.

45.    A forged deed is void ab initio and there is no statute of limitations for

challenging a deed as forged. A forged deed under the criminal law, is a forged

11

deed under the civil laws, and with this in mind, it is entirely appropriate to discuss

forgery and forged deeds here.

46.        New York Penal Law, PEN § 170.10, titled "Forgery in the second

degree", states:

> A person is guilty of forgery in the second degree when, with intent to
> defraud, deceive or injure another, he falsely makes, completes or
> alters a written instrument which is or purports to be, or which is
> calculated to become or to represent if completed:
>
> 1.   A deed . . . or other instrument which does or may evidence,
> create, transfer, terminate or otherwise affect a legal right, interest,
> obligation or status;  **or**
> 2.   A public record, or an instrument filed or required or authorized
> by law to be filed in or with a public office or public servant . . .

47.   The essence of the defendants' and each of their fraudulent scheme, was to

contact former owners, whose shares were known to have been sold to a new

owners who didn't recorded their deed because they were told not to record their

deed, and have the former owner execute, a second deed to the Plaintiff LLC

effectively cutting out the new owner of the Pool Property interest. By repeating

this scheme three different times with regard to three different deed chains by

contacting multiple former owners, the Plaintiff LLC was able to acquire at a de

minimus price, three fraudulent deeds to three different interests in the Pool

Property. After manufacturing fraudulent deeds for the PICCONE, AGOLIATI and

Grigoli, interests, the Plaintiff LLC and it's attorney brought this frivolous

litigation, to obtain a Court order without serving same, on any of PICCONE

AGOLIATI and Grigoli, in order to legally wipe away any remedies that

PICCONE, AGOLIATI and Grigoli would have to regain their property. There is

at least clear and convincing evidence demonstrating this scheme.

48.    We know that the Plaintiff LLC's attorney prepared each of the deeds from

the Rothman's, DuSold's and Miller's because Attorney admits his role:

> "**I prepared deeds** . . . I haven't dealt with them in any respect other
> than the fact that **I prepared deeds** and they were mailed out to them
> and mostly to their attorneys".

49.    Then, with regard to the Miller interest, it is clear from Attorney Gross' own

correspondence that he had actual knowledge that Lynne Miller and her husband

had sold their interest in the late 1980's, such that by 2014, Attorney Gross knew,

or should have known that under Real Property Law § 245, Lynne Miller had no

right title or interest in the Pool Property to sell to Plaintiff LLC. For example,

Attorney Gross's letter of September 8, 2014, to Lynne Miller's attorney, states:

> I have recently spoken to Lynne Miller. She is willing to help us, but
> is unsure of her rights and potential liabilities. **She is quite sure that
> she and her late husband sold/transferred their one-eighth
> interest, at some point in the late 1980's to one of the neighbors of
> the subject "pool" property,** but is not sure to whom.

50.    As of the date of his letter, Attorney Gross was on actual notice, that Lynne

Miller was "quite sure" that Lynne Miller was not the owner of an interest in the

Pool Property, and that any deed from her to the Plaintiff LCC would convey

nothing of value. On October 2, 2014, Attorney Gross wrote to Lynne Miller stating:

> Mrs. McCarthy does not seem to recall the terms of the disposition made of your 1/8 share of the property, that was originally acquired by you and Dr. Miller, pursuant to your 1970 deed. **She does recall that it was sold and/or conveyed out, many years ago**, but does not presently recall any of the details of such transaction.

51.    By this statement, above his own signature, on his own letterhead, Attorney Gross corroborates through the former Pool Manager Carmel McCarthy's recollections, that the Miller's had sold their interest the Pool Property years ago.

52.    Attorney Gross also states:

> We have checked and double checked the records of the Richmond county clerk, but find that there is no deed of record disposing of this fractional interest that you acquired 44 years ago.

53.    Here Attorney Gross convinces Ms. Miller that a very accurate and thorough search of the public records and that there is no deed "of record" dealing with the sale Ms. Miller was "quite sure" happened in the "late 1980's". Then attorney Gross says:

> Accordingly, the title is still in your name.

54.    This is a false statement. The title is in the name of whoever Mrs. Miller and her husband previously sold the property to. By Attorney Gross making this false statement he is telling Ms. Miller that although she no longer has ownership, she is in a position to help the real owner of the property, with Mr. and Mrs. DiForte,

14

being the majority owners, clear title. This can be considered an appeal to Ms.

Miller's ability to be neighborly and feel good by helping others.

55.     Under New York law someone who does not own an interest in real property

conveys nothing when they sign a deed for selling that property to another.

56.     Next Attorney Gross induces Ms. Miller to help because it will not cost her

anything to help:

> If you are willing to help us in this matter, I will be happy to prepare
> the quitclaim deed, and will submit it, together with all necessary
> transfer documents, to Mr. Kuhn, for his review and approval. We
> will be happy to pay his fees for his professional services in advising
> you, and will assume responsibility for any collateral expenses that
> you may incur. We will of course, pay any required recording and
> transfer fees.

57.     The overall letter, based on false premises that Mrs. Miller could convey

something that she did not own, induced Lynne Miller to execute a deed to the

Plaintiff LLC that Attorney Gross knew, once recorded, would create the false

appearance that the Plaintiff LLC would own the former Miller interest in the Pool

Property that had actually been sold to an as yet unknown third party decades

before.

58.     Knowing that the Miller's no longer owned anything of value which they

could sell, Attorney Gross went ahead and prepared and had executed and

acknowledged a deed from Lynne Miller to the Plaintiff LLC. As will be shown,

Attorney Gross then repeatedly violated Court orders and failed to disgorge these

documents. Any reasonable person can infer Attorney Gross's intent to defraud by

concealing this correspondence to hide his misconduct, and prevent PICCONE,

AGOLIATI and Grigoli from using this material to show fraud.

59.    This letter continued:

> Lynne's only concern appears to be that she wants to be assured that
> if, at some future date, someone comes "out of the woodwork" to
> claim her interest, she will have no potential liability. I briefly
> explained to Lynne that, for this reason, I suggested a quitclaim deed,
> by which she would make no representations or warrantie, and would
> only convey such interest, if any, as she may have.

60.    This passage is important to show that Attorney Gross knew at the time he

was preparing the deeds from the Rothman's, DuSold's and Miller's to the Plaintiff

LLC, that he knew of Real Property Law § 245 stating that a deed cannot convey a

greater interest in the property than that held by it's grantor.  Attorney Gross knew

that Lynne Miller was not conveying any interest to the Plaintiff LLC using a

quitclaim deed because she owned no interest in the Pool Property having been

"quite sure" that she sold her share in the "late 1980's".

61.    Defendants obtained this correspondence by legally serving a subpoena on

the law firm that used to represent Carmel and Roger McCarthy and Lynne Miller

among others. By Attorney Gross repeatedly defying a Judges orders compelling

production of this and other non-privileged third party correspondence, Attorney

Gross was denying the Defendants the very evidence they needed to prove first that

16

Lynne Miller had previously sold her interest in the Pool Property; that Attorney

Gross knew that the Lynne Miller Quitclaim deed was worthless; and, that

Attorney Gross was creating a potential "liability" for all involved, including the

elderly Ms. Miller, by performing this kind of deed scam.

62.     Attorney Gross continued to induce Lynne Miller into signing the deed

prepared by Attorney Gross by having her seek independent legal advice from the

attorney whom the letter was addressed to:

> However I explained to Lynne that should consult her own,
> independent counsel, and not rely on me. I believe that if she received
> from you, an independent opinion, as to the legal significance of a
> quitclaim deed, she would feel more confident about this conveyance.

63.     Attorney Gross even agreed to pay for Lynne Miller's legal fees stating:

> We will of course, assume the burden and cost of recording the
> documents and paying whatever transfer taxes, if any may be
> required. **Please send me a bill for your services and for any
> related expenses** that may be incurred by Ms. Miller in connection
> with this matter.

64.     But then once he had sent the deed he prepared to Lynne Miller, Attorney

Gross cut her independent counsel out of the loop, and dealt with Lynne Miller

directly. Apparently, Attorney Gross had additional correspondence with Ms.

Miller that he has failed to produce during discovery, despite Court orders

compelling production of same, in which he forwarded Ms. Miller all necessary

closing documents for the property, and received correspondence from Ms. Miller

returning the executed documents.  Defendants still do not have copies of these

documents. On April 20, 2015, Attorney Richard Kuhn, Mrs. Miller's previous

attorney wrote to Attorney Gross stating:

> Are you still seeking to obtain a deed from Lynn Miller concerning
> the Hillview Place property for your client, Block 865 Lot 300 LLC.
> I am wondering whether I can close this file.

65.    On the bottom of this letter, Attorney Gross then writes back to Attorney

Kuhn:

> Thank you for your cooperation in this matter. Lynne Miller executed
> the deed, had it acknowledged in Florida and returned it to me. She
> was very pleasant to deal with.
>
> You may close your file.

66.    From the letter we know that Attorney Gross circumvented the attorney-

client relationship between Mrs. Miller and her attorney so that Mrs. Miller may

not have ever received the benefit of the independent advice of counsel that she

required to make an informed decision about how to proceed and what the

consequences of signing a fraudulent quit claim deed were.

67.    This is a classic case of an unscrupulous attorney, taking advantage of an

elderly woman for personal gain.  It is Lynne Miller who would be left having to

explain why she sold her property twice, once in the "late 1980's" and the second

time to the Plaintiff LLC. The Plaintiff LLC would become unjustly enriched by

the difference between what Lynne Miller received for her bogus quitclaim deed in 2014, and the actual value of that 1/8 interest in the Pool Property, more than $60,000.00.

68.   But the one instance documented with Lynne Miller was repeated by Attorney Gross over and over again, with the 2014, Rothman and DuSold, deeds.

69.   The 2014, Rothman to Plaintiff LLC deed followed the same pattern. Walter Rothman similarly testified that before he and his wife signed a deed to the Plaintiff LLC he told Attorney Gross that they had sold their interest in the Pool Property in 1972:

> 5.   At somepoint in the 1970's (I believe in or about 1972) I sold my interest . . .
>
> 6.   I had communications with Attorney Gross in 2014, in which I told him that my wife and I sold our interest in the property years before. . .

70.   Knowing of Rothman's 1972 sale, Attorney Gross knew that the Rothman's could not convey anything of value to the Plaintiff LLC, under Real Property Law § 245.  The Rothman's sold all right, title and interest they owned in the Pool Property in the 1970's and had nothing left to sell the Plaintiff LLC in 2014. We know Attorney Gross knew this law from his preparation of the fraudulent Miller to Plaintiff LLC deed.

71.     However, the Rothman situation was significantly more egregious.  Attorney

Gross did not prepare a Quitclaim deed for the Rothman's to execute to the

Plaintiff LLC. Attorney Gross prepared a deed in which the Rothman's cover up

that they had not previously sold their interest in the 1970's, thus creating a huge

liability for the Rothman's if this situation blew up. For example, the Miller to

LLC Deed states that Miller as the Grantor: "does hereby remise, release and

**quitclaim**, unto the . . ." Plaintiff LLC. While the language used in the Rothman to

Plaintiff LLC deed states: "does hereby grant and release unto the . . ." Plaintiff

LLC, when Attorney Gross knew that the Rothman's owned no interest in the Pool

Property which they could "grant". The Rothman to Plaintiff LLC deed continues

stating "[b]eing the same premises conveyed to the Grantors herein by deed dated

April 24, 1970 and recorded April 27, 1970, in Liber 1900, Page 39". Another false

statement, prepared by Attorney Gross, and presented to the two elderly Rothman's

for execution and notarization.

72.     Attorney Gross is the only witness within the jurisdiction of this Court who

knows, for example, what his written communications with Rothman were.  But

even without the written correspondence with Attorney Gross, Rothman's

affidavit, establishes that Attorney Gross, and therefore the Plaintiff LLC, knew

that in 2014, Rothman had no right, title or interest to convey to the Plaintiff LLC,

and the deed from Rothman to the LLC conveys nothing.

73.    By failing to produce his non-privileged correspondence to, and from, the Rothman's, as ordered by this Court on multiple occasions, for the past two and one half years of litigation, as Defendants have requested, attorney Gross has engaged in fraud by omission, the spoliation of evidence and contempt of Court.

74.    This is an important point, because Attorney Gross engaged in a pattern of misconduct, that is revealed by his actions.  This was not a single incidence which can be explained away, but three distinct transactions, together with a pattern of obviously unethical litigation behavior, that, as will be shown, is entirely consistent with a focused goal of financial gain by fraud.

75.    The 2014 transaction involving the DuSold to Plaintiff LLC deed also followed the pattern demonstrated above with regard to Miller and Rothman.

76.    We know from the discussion above, that the DuSold's sold to Agoliati in 1992. AGOLIATI has a notarized deed, a mountain of corroborating documents and the testimony of Leonard DuSold all clearly evidence this 1992 sale.  All of the hundreds of pages of documents from PICCONE, AGOLIATI and Grigoli, as well as the two documents that Plaintiff LLC has produced, confirm that between 1992 and 2014, all parties knew of Agoliati's interest, including the DuSold's. Yet attorney Gross prepared a warranty deed for the DuSold's to execute and have notarized for the DuSold to Plaintiff LLC deed. For example, in addition to the grant language used in the Rothman deed, as as opposed to the quitclaim language

21

in the Miller deed, Attorney Gross inserted the following warranty language into this deed:

> And the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

77.    This language means that the DuSold's were falsely warrantying under oath, that they had not sold to Agoliati in 1992. By inserting this warranty language into the DuSold deed, Attorney Gross, created a legal liability for the Dusold's, whom are both of advanced age. Moreover, this liability is to the Plaintiff LLC, such that the Plaintiff LLC can sue the DuSold's for having sold their interest twice, once to AGOLIATI in 1992, and the second time in 2014, to the Plaintiff LLC.

78.    These circumstances show that Attorney Gross has objectively taken advantage of and exposed to significant liability, each of the elderly, Lynne Miller, the Rothman's and the DuSolds. The legal mess created by Attorney Gross's actions have yet to be sorted out. Add to this legal confusion, the legal problems created by the Plaintiff LLC attempts to steal the PICCONE, AGOLIATI and Grigoli interests in the Pool Property, and one starts to get a sense of the wreckage Attorney Gross has produced. As will be shown shortly, Attorney Gross has repeatedly violated Court orders to hide the correspondence with Miller, Rothman and DuSold which exposes both his misconduct, and the bad faith of the now four year old litigation that this partition action represents.

22

79.     Perhaps the most damning evidence against Attorney Gross, is his own
acknowledgment that this conduct is fraud. During the Framed Issue Hearing,
Attorney Gross stated:

> Secondly Judge, there is a surreptitious issue here as to who
> committed the fraud. No representations were made by the plaintiff.
> All of these frauds he is talking about, these are frauds made by other
> parties. These are the parties who allegedly issued multiple deeds and
> have no record of it . . .

80.     Attorney Gross, acknowledges his understanding that his conduct is fraud,
buts points to the elderly, Rothman`s, DuSold`s and Miller`s, as having committed
the fraud.  Attorney Gross seeks to blame the former owners who, attempting to
help Attorney Gross out, and at his request, signed deeds admittedly prepared by
Attorney Gross. But the Rothman`s, DuSold`s and Miller`s, did not set up these
transactions, or prepare or record the deeds, or pay the closing expenses, including
attorneys' fees: Attiorney Avery Gross did!

81.     The New York Supreme Court Partition action relating to this property is a
continuation of the Plaintiff LLC's strategy to grab PICCONE's, AGOLIATI's and
Grigoli's, interests, by denying the Defendants access to the evidence they needed
to prove the Plaintiff LLC's nefarious scheme.

82.     Letter to Marla DiForte from Attorney Richard Kuhn, dated September 11,
2000:

23

> The purpose of this letter is to address the fact that under provisions in all deeds, if any owner decides to sell his interest, he must offer it first to all other owners under a thirty day option.

83.    By this right of first refusal appearing in every deed conveying an interest in the Pool Property as a covenant running with the land, Marla DiForte, and therefore the Plaintiff LLC, had actual notice that all owners were to be advised of the sale of any interest in the Pool Property. The effect of this provision was to notify all owners whenever any interest in the Pool Property was conveyed. Yet when the Plaintiff LLC and Attorney Gross set out in the second half of 2014 to "consolidate" all of the shares of the Pool Property, the Plaintiff LLC induced deeds from the Rothman's, Miller's and DuSold's without letting any of the other owners know of these alleged transfers.  By keeping these transactions secret, Attorney Gross prevented the other owners like PICCONE, AGOLIATI and Grigoli from objecting to these deals on the basis that the Rothman's, Miller's and DuSold's interests had already been sold decades before and that these interests were actually owned by others.  By hiding their actions the Plaintiff LLC was able to effect their scheme to unjustly enrich themselves by creating three forged and fraudulent deeds for three different interests in the Pool Property for approximately one thousand dollars a piece, which were then worth almost two hundred thousand dollars when recorded in the Plaintiff LLC's name.

84. Using the consideration of $1,000.00 listed in the transfer documents which Attorney Gross prepared for each of the three deeds he prepared from Rothman, DuSold and Miller to the Plaintiff LLC, any reasonable person can see that the difference between the price paid and actual value of each 1/8 interest is considerable and provides a financial motivation to commit fraud. When the $63,750.00 individual mark up for each 1/8 interest the Plaintiff LLC would receive upon sale to a third party is multiplied for just the three shares that Plaintiff LLC is attempting to grab from PICCONE, AGOLIATI and Grigoli, the financial incentive gets considerably greater and goes to $191,250.00. However as will be shown below Attorney Gross and the DiForte's actually intended to develop this property as a single family home in a neighborhood of multimillion dollar mansions. The profit upside in this case is unknown at present, but is believed to be considerably higher than just the multiple of the three PICCONE, AGOLIATI and Grigoli shares. The financial incentive should be apparent to any reasonable person.

85. Later in 2014, while in the process of recording deeds from Rothman, DuSold, and Miller to the Plaintiff LLC, Attorney Gross admitted that he is a member of the Plaintiff LLC in sworn documents submitted to government agencies of the City of New York. For example, the Real Property Transfer Report for the Miller to Plaintiff LLC, transaction, reveals that Attorney Gross signed this

form on behalf of the Plaintiff LLC, added a comma after his name and then

inserted the word "MEMBER" next to his name, in his own handwriting.

According to New York law, the word "Member" in connection with an LLC

means that the person is an owner of an interest in the legal entity.

86.     Attorney Gross stated that he was a member of the LLC underneath the

statement "CERTIFICATION" stating:

> I certify that **all of the items of information entered on this form
> are true and correct** (to the best of my knowledge and belief) and I
> understand that the making of a willful false statement of material fact
> herein will subject me to the provisions of the penal law relative to the
> making and filing of false instruments. [emphasis added]

87.     Next to Attorney Gross's signature block is an insert for the name of the

"BUYER's ATTORNEY" and attorney Gross, inserted his own name, identifying

himself as an attorney for the Plaintiff LLC (the Buyer).

88.     Attorney Gross's sworn statement that he is a member of the Plaintiff LLC is

sufficient in and of itself to establish by clear and convincing evidence that

Attorney Gross has a financial stake in the Plaintiff LLC.

89.     But Attorney Gross has sought to explain away this oversight away as

follows:

> The subject RP-5217 NYC report was personally filed by me, at the
> Office of the Richmond County Clerk. Prior thereto, all documents
> that were required to be filed together with the deed, requiring
> signatures of the purchaser, (conspicuously absent from the movants'
> papers,) were duly signed by Ms. DiForte, on behalf of the plaintiff.

> The signature below the certification line was inadvertently omitted.
> When I submitted the papers at the County Clerk's Office, in person,
> this omission was called to my attention. I advised the clerk that I
> would retrieve my papers and get it signed by my client, whereupon
> the clerk advised me that, if I was the attorney of record and was
> authorized, I could sign the form myself, which I thereupon did.

90.    Attorney Gross's statement is problematic for several reasons. If, as he says,

he, placed the word "member" next to his name when he knew that he was not a

member of the Plaintiff LLC, then he deliberately made a false statement under

penalty of perjury, on an form for submission to a government agency. This is a

serious offense, especially for an attorney, who swore to uphold the laws of New

York.

91.    Moreover, Attorney Gross states that the Clerk specifically told him he

could sign as the Attorney of record, which is consistent with New York law, but

Attorney Gross then signed as a "**Member**" of the Plaintiff LLC.  A reasonable

jury could conclude that Attorney Gross was a member of the Plaintiff LLC having

a significant financial interest in having a forged deed recorded that allegedly

transferred an interest in the Pool Property to a legal entity in which he had an

ownership interest. In the alternate, Attorney Gross, as he himself admitted, who

has been practicing law for decades, knowingly gave false information on an

official government submission.

92.     Moreover, undersigned has submitted two deeds for filing at the Richmond

County Clerk's Office on two separate occasions over the past year and in both

instances, the County Clerk's Office refused to look over the documents prior to

putting them into the recordation basket stating emphatically that the official policy

of the Clerk's Office was not to review documents before formal review.  In both

instances, undersigned personally asked to see the supervisor who verified that the

Clerk's Office would not even review the number of pages to ensure the page

count was correct before the deed was submitted for recordation.  This alone calls

into question Attorney Gross's story.

93.     Marla DiForte`s explanation of Attorney Gross's submitting false

information on a government form is that "[i]t was simply an expedient matter of

convenience under the circumstances".  However, Marla DiForte`s willingness to

lie under oath as an "expedient matter of convenience" calls into question all of her

testimony in this litigation.

94.     A reasonable juror reviewing this correspondence can conclude that John

and Marla Diforte own an interest in the LLC together with Attorney Gross, and

that they have all lied.

95.     Marla Diforte says she had never seen any of the correspondence Attorney

Gross had with third parties and did not have copies of same.  The correspondence

between Attorney Gross and an Architect regarding the Pool Property is also consistent with Mr. Gross having an interest in the pool property.

96.     Attorney Gross exchanged two letters with an architect concerning a "Project Description: Obtain Approval and Permit for a detached One Family Residence", regarding Block 865, Lot 300. The first letter to the Architect, dated October 30, 2015, before the instant lawsuit was served on PICCONE, AGOLIATI or Grigoli, is a detailed description of the steps Attorney Gross has taken to perform a due diligence as to how to ensure the property will be approved for a development as a single family residence. The letter is important because in it's three pages it never mentions the Attorney Gross's client, the Plaintiff LLC, in any context whatsoever. This absence is noteworthy because one would expect an Attorney to mention his client by name even once, even as a copyee on the correspondence. In addition, the letter is only copied to "John and Marla DiForte".

97.     In this correspondence Attorney Gross repeatedly refers to himself as an owner of the property. For example, Attorney Gross states: "I examined three surveys, from the Block 865 file, related to **our** lot 300, two of them made by Wohl and O'Mara and one by Williams Rogers". [emphasis added]; "My belief is that, at one time, William Lavori owned all of the turf from Hillview Place to **our** lot 300"; and, "Based on all of the above, **our** right of access appears to be well established".

29

98.     PICCONE raised this issue in their motion to recuse Attorney Gross, and he

responded as follows:

> that your affirmant's letter to the acrhitect referred to my client's
> property as "our' property, with a plural possessive pronoun ("our"),
> by which counsel refers to, and identifies with, the interest of his
> client, Block 865, Lot 300, LLC hardly proves that he or John DiForte
> have any proprietary interest in the property. It is much easier and
> practical, in colloquial speech, to refer to the subject parcel of one's
> client as "our" lot, than saying and repeating "the parcel known as
> Block 865, Lot 300, LLC."

99.     But, as stated above, Attorney Gross never mentions his client, the "Block

865 Lot 300 LLC", in his October 30, 2015 letter to the Architect. Any reasonable

person reviewing Attorney Gross's letter would not know who Attorney Gross's

client was because he never mentions the Plaintiff LLC. Moreover, Attorney

Gross's ease of use argument falls aside when one considers that, regardless of

ownership, once he identified the property by it's block and lot designation the first

time, he could have used fewer words by leaving out the pronoun "our". For

example, "I examined three surveys, from the Block 865 file, related to **our** lot 300

. . . " becomes "I examined three surveys, from the Block 865 file, related to lot

300 . . .". "My belief is that, at one time, William Lavori owned all of the turf from

Hillview Place to **our** lot 300" becomes "My belief is that, at one time, William

Lavori owned all of the turf from Hillview Place to lot 300". Without a pronoun

referring to ownership, these sentences incontestably become less words, and easier to read.

100.   Attorney Gross seeks to explain away his extended personal involvement in visiting city agencies doing work usually reserved for architects and expeditors, as well as his use of personal pronouns like we, our, and me in this letter as follows:

> It is obviously of interest to any potential holder of an interest therein, at such a sale, to have some idea as to its market value and/or potential development value. To that end, it would be quite natural for a potential or actual party in interest to inquire of an architect as to the challenges that might exist in attempting to secure approval for the development of a land-locked parcel. And it would not be unusual for a party's spouse or attorney to assist in such an inquiry. These circumstances do not prove that either John DiForte or Avery Gross have any personal interest in the subject parcel nor that there is any pending "deal" or plan to develop the parcel.

101.   But again, any feasibility study for the development of land turns on the architects' assessment of the cost and probability of obtaining approval to build. That assessment had been sought and rendered 25 years before by the same architect, Michael DeRuvo. By letter dated May 9, 1991, this architect had indicated that approval for a "custom one family" required fire department approval regarding the easement governing access to the property and Department of Environmental Conservation "conformation" as to the wetlands status of the land. The Architect concluded in 1991 "[i]f these two items are cleared it would be safe to proceed with the applications and plans" (See, Ex. I, 4-4). This 1991 letter

31

was directed to John DiForte and was mentioned repeatedly in other correspondence mentioning PICCONE and Grigoli as owners, including the April 25, 1991 Meeting of Pool Property Owners stating "John DiForte offered to discuss, with an architect, the feasibility of construction on the site with it's inherent characteristics". On 1991, as in the present, it was not necessary for a skilled architect to have Attorney Gross visit several City Agencies to determine feasibility.

102.   Attorney Gross need not have spent the significant periods of time he spent on the property as that work had already been brought to the point necessary to determine whether the project was viable and what impact this would have on the land.

103.   The Architect sent a letter dated January 16, 2016, to "Avery Gross" and "John DiForte", which again did not mention the Plaintiff LLC anywhere in its two pages.  It seems clear that without the Plaintiff LLC having been mentioned a single time in any of these five pages of correspondence, that no third party reviewer would know of the Plaintiff LLC's involvement.

104.   In this letter, Attorney Gross describes how he visited the "Topographical Bureau", the New York City "Department of Finance" the Richmond County Clerk's Office, and "Wohl and O'Mara" civil engineering firm, with future plans for visits to the Building Department and Fire Department. Based on the content

32

and tone of Mr. Gross's letter he spent considerable time, on the order of days, visiting various City agencies and reviewing material regarding the property, and writing his letter to Architect DeRuvo.

105.   Through out this litigation, Attorney Gross has sought to minimize his financial interest claiming that he is just an attorney trying to resolve some title issues to a property. He has stated:

> We are seeking a deed, or a replacement deed, from whomever has a
> proper title to this missing fractional interest.

106.   But we know that Attorney Gross didn't ask for specific information, such as who did you buy your interest from, which almost certainly would have been answered with the requested information. Attorney Gross asked for copies of deeds, which were not then available. Moreover, we don't know what information Attorney Gross received from the Rothman's, DuSold's and Miller, because Attorney Gross was the one who spoke to them and he has violated Court orders to avoid deposition. Moreover, Attorney Gross has refused to appear at three different Court ordered deposition dates.

107.   Having the background that Attorney Gross, and, his principle, the Plaintiff LLC, has a financial motive to defraud PICCONE, AGOLIATI and Grigoli, it is now appropriate to describe the fraudulent scheme, which the Plaintiff LLC, and

it's counsel, used to remove the legitimate ownership rights of three completely innocent real property owners for financial gain.

108.   The filing of a complaint for partition in November of 2014, furthered this scheme.  That Partition action did not name either PICCONE, who was a record deed owner, nor AGOLIATI, nor Grigoli.  A partition action by it's nature extinguishes the interests of any third party having a claim. The partition action requested just this relief. Paragraph 6 of the prayer for relief in the complaint initiating this partition action states:

> That by virtue of the partition judgement to be entered herein, and the sale and conveyance to be made thereto, the plaintiff and defendants, and all persons claiming through or under them, or any of them, subsequent to the filing of the notice of pendency of this action, be barred of all right, title and interest in, or claim to, the Property, or any part thereof.

109.   The failure to serve PICCONE for a year, until December 2015, and the complete failure to serve AGOLIATI and Grigoli, whose claims to ownership had been previously acknowledged in writing by both Marla DiForte and Attorney Gross, is all consistent with a plan to see if the elderly PICCONE's would become invalids, or worse, in the interim and to cut out AGOLIATI and Grigoli entirely.

110.   Attorney Gross discovery abuses are similarly cynical.  PICCONE's September 28, 2017,  Second Motion To Compel Production of Documents

Responsive to Discovery Demands, sought, among other documents, long overdue

production of:

### PICCONE'S REQUEST FOR PRODUCTION OF DOCUMENTS

11.     Any and all documents relating to or concerning any ownership interest in the Property including but not limited to any of: Lawrence Miller, Leonard DuSold, Walter Rothman, Mary Lavori, Richard Makarski, Carmel T. McCarthy, Marla Diforte and/or John DiForte.


### PLAINTIFF's RESPONSE

11.     Plaintiff has no documents relating to the ownership interest in the subject property of parties named Miller, DuSold, Rothman, McCarthy or DiForte, except for copies of that may be annexed to plaintiff's aforementioned motion papers for summary judgment, all of which have been duly served upon all appearing defendants, and which are recorded in the Office of the Richmond County Clerk.

### PICCONE`S SEPTEMBER 28, 2017, MOTION TO COMPEL

11.     The Plaintiff LLC has not produced correspondence between Avery Gross and each of the DuSold's, the Miller's and the Rothman's at least with regard to Avery Gross's offers to purchase any interest in the Pool Property. And these are only the third party claimants which the PICCONE's know of. For example, the PICCONE's have discovered numerous pages of letters between Attorney Avery Gross, as attorney for the Plaintiff LLC, and both the DuSold's, and an attorney for the Millers. Moreover, Leonard Rothman has indicated that he has also exchanged correspondence with Attorney Gross, but no longer has copies of that correspondence. Attorney Gross, as an attorney licensed in New York is obligated to keep client files for a period of seven (7) years under New York law. The Plaintiff LLC and it's attorney's failure to provide copies of highly relevant correspondence regarding the fraudulent transfer of interests in the Pool Property claimed by the Defendants is indicative

of bad faith and an acknowledgment that the withheld documents are damaging to the Plaintiff LLC case.

111.   Additional motions, including motions for contempt were filed against Attorney Gross for violating the Court's orders to compel and to appear for a deposition in August, 2017. Attorney Gross cancelled, rescheduled or otherwise delayed any accounting for actions through the fall of 2017, effectively delaying all aspects of this litigation until a December 14, 2017, hearing when Judge Minardo ruled that Attorney Gross had to produce the long hidden documents requested in the PICCONE, September 28, 2017, Second Motion To Compel, by January 17, 2018, and appear for his long delayed deposition on January 25, 2018, or, the Plaintiff's Partition Action would be dismissed with prejudice.

112.   Attorney Gross, again defying this Court's order, failed to produce any of the documents the Court ordered him to produce and failed to show for his thrice scheduled Court ordered deposition. Attorney Gross's last excuse was that he decided to extend his two month overseas vacation to attend a family function.

113.   Judge Minardo retired in December 2017 and Judge Marin took over this case in January, 2018. Judge Marin has been singularly unwilling to enforce Defendants rights to discovery or to a fair hearing of their case.

114.   As recently as the framed issue hearing when PICCONE brought their Fourth Motion To Compel the long requested correspondence, Attorney Gross was still equivocating stating:

36

THE COURT: The correspondence, do you have that correspondence?

MR. GROSS: Your Honor, I don't know specifically what correspondence he wants. . .

115.   This is not a difficult issue to understand. PICCONE has a right to this non-privileged correspondence between Attorney Gross and the Rothman's, DuSold's and Miller, and have received several Court Orders compelling it's production. Attorney Gross has refused to comply, completely defying all Court orders in an outrageous manner. It is high time for this Court to do the right thing and require the full disclosure that fairness demands.

116.   Attorney Gross had the financial motive to commit fraud, he was admittedly a member of the Plaintiff LLC, he knew that there were unrecorded deeds conveying interests in the Pool Property, he failed to take the easy steps to find out who had conveyed interests to the individuals holding the unrecorded deeds, he prepared deeds from former owners whom he knew no longer owned interests in the Pool Property to the Plaintiff LLC, and then he took an active role in denying PICCONE, AGOLIATI and Grigoli access to the documents, like unprivileged discoverable correspondence with Rothman, Miller and DuSold, which exposes his misconduct to the light of day. Juries have convicted perpetrators of criminal fraud on significantly less evidence than there is against the Plaintiff LLC and it's attorney.

## COUNT 1
## FRAUD
## The Rothman to Defendant LLC Deed

117. Plaintiff incorporate herein by reference the allegations contained in all foregoing and all following paragraphs into this their 1st cause of action.

118. The defendants and each of them made a false misrepresentation of a past or present material fact regarding the Pool Property and it's established ownership.

119. The Defendants, and each of them, knew they were making a false assertion to induce an act or to justify the Plaintiff to act.

120. One or more of the Plaintiff's were induced to act, or to refrain from action, or were justified in acting in reliance on the misrepresentations of the Defendants and each of them.

**121.** One or more of the Plaintiff's were damaged as a result of the Defendants, and each of their, actions.

## COUNT 1
## FRAUD
## The Rothman to Defendant LLC Deed

122. Plaintiff incorporate herein by reference the allegations contained in all foregoing and all following paragraphs into this their 1st cause of action.

123. The defendants and each of them made a false misrepresentation of a past or present material fact regarding the Pool Property and it's established ownership.

124. The Defendants, and each of them, knew they were making a false assertion to induce an act or to justify the Plaintiff to act.

125. One or more of the Plaintiff's were induced to act, or to refrain from action, or were justified in acting in reliance on the misrepresentations of the Defendants

and each of them.

**126.**   One or more of the Plaintiff's were damaged as a result of the Defendants, and each of their, actions.

**COUNT 2**
**FRAUD**
**The Miller to Defendant LLC Deed**

127.   Plaintiff incorporate herein by reference the allegations contained in all foregoing and all following paragraphs into this their 2nd cause of action.

128.   The defendants and each of them made a false misrepresentation of a past or present material fact regarding the Pool Property and it's established ownership.

129.   The Defendants, and each of them, knew they were making a false assertion to induce an act or to justify the Plaintiff to act.

130.    One or more of the Plaintiff's were induced to act, or to refrain from action, or were justified in acting in reliance on the misrepresentations of the Defendants and each of them.

**131.**    One or more of the Plaintiff's were damaged as a result of the Defendants, and each of their, actions.

**COUNT 3**
**FRAUD**
**The DuSold to Defendant LLC Deed**

132.   Plaintiff incorporate herein by reference the allegations contained in all foregoing and all following paragraphs into this their 3rd cause of action.

133.   The defendants and each of them made a false misrepresentation of a past or present material fact regarding the Pool Property and it's established ownership.

134.   The Defendants, and each of them, knew they were making a false assertion to induce an act or to justify the Plaintiff to act.

135.    One or more of the Plaintiff's were induced to act, or to refrain from action,

39

or were justified in acting in reliance on the misrepresentations of the Defendants and each of them.

**136.**   One or more of the Plaintiff's were damaged as a result of the Defendants, and each of their, actions.

**PRAYER FOR RELIEF**

WHEREFORE, to redress the injuries proximately and directly caused by Defendants' conduct as stated in Paragraphs 1-136 above, Plaintiff requests:

a. damages in an amount to be established at trial as compensation for  the fraudulent conveyances used to deprive Plaintiff of his real property;

b. damages in an amount to be established at trial to punish Defendants for fraudulent conduct pursued over a course of years;

c. treble punitive damages for acts of blatant fraud;

d. an award for reasonable and customary costs, expenses and interest incurred in pursuit of this action;

e. attorneys fees; and,

f. whatever additional relief the Court may deem just and proper.

**WHEREFORE**, Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,
By Plaintiff

Electronically signed
/s/ Chris Agoliati

September 26, 2019

Chris Agoliati, Pro Se
30 Heritage Court
Towaco, NJ 07082
(908) 489-1076