UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X
CHRIS AGOLIATI, JERRY GRIGOLI, and
LOUIS PICCONE,

                     Plaintiffs,

       -against-

BLOCK 865 LOT 300 LLC, JOHN
DIFORTE, MARLA DIFORTE, CARMEL
MCCARTHY, and AVERY GROSS,

                     Defendants.
----------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
19-CV-5477 (WFK) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

      Plaintiffs Chris Agoliati, Jerry Grigoli, and Louis Piccone ("Plaintiffs") brought

this action against Defendants Block 865 Lot 300 LLC ("LLC Defendant"), John and

Marla DiForte, Carmel McCarthy (together with LLC Defendant, "represented

Defendants"), and Avery Gross (proceeding *pro se*) (collectively, "Defendants")

regarding a dispute over the ownership of fractional shares of a swimming pool

property on Staten Island, New York. (*See* Compl., ECF No. 1; *see also* Am. Compl., ECF

No. 5.)[1] On December 17, 2021, the Honorable William F. Kuntz, II, granted Defendants'

motion to dismiss. (Order, ECF No. 111.) Plaintiffs appealed to the Court of Appeals for

the Second Circuit, which remanded the case for a determination of "whether there is

complete diversity of citizenship between Plaintiffs and Defendants and whether each

of the Plaintiffs has satisfied the amount-in-controversy requirements of [28 U.S.C.]

§ 1332." *Agoliati v. Block 865 Lot 300 LLC*, No. 22-51, 2023 WL 405769 (2d Cir. Jan. 26,

---

[1] Plaintiffs' amended complaint may be missing two pages. The paragraph numbering
pauses at ¶ 117 and restarts at ¶ 125, and the page numbering pauses at page 32 and restarts at
page 35. (*See* Am. Compl., ECF No. 5.)

2023) (summary order). On January 26, 2023, Judge Kuntz referred the Second Circuit's summary order to the undersigned Magistrate Judge for a report and recommendation. (Order, ECF No. 117.) Based on the findings of fact and conclusions of law set forth below, the Court recommends finding that at the time the relevant complaints were filed, (1) Plaintiff Piccone was domiciled in Canada, (2) Plaintiff Agoliati was domiciled in New Jersey, (3) Defendant Gross was domiciled in New York, (4) Defendant LLC was domiciled in New York, and (5) Plaintiffs' amended complaint alleges a sufficient amount in controversy under 28 U.S.C. § 1332. Due to these findings, as this case stands presently, the Court recommends finding that complete diversity of citizenship is lacking due to Plaintiff Piccone's domicile outside the United States.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Factual Background

As noted above, this case concerns a property dispute over ownership of the property located at block 865, lot 300 (the "Property" or "Pool Property") on Staten Island. (Am. Compl., ECF No. 5, ¶¶ 1, 11.) Plaintiffs allege that the Property was split into eight fractional interests in 1966, and that the deed to each interest contained a "covenant for a right of first refusal allowing present owners of an interest in the Pool Property to buy the share(s) of a selling owner in a way that allows the present owners to control the property." (*Id.* ¶¶ 14–15.) According to Plaintiffs, "[e]ach of the Pool Property owners was advised that they should not record their deeds by the Pool Property manager or the Pool Property manager's agent." (*Id.* ¶ 28.)[2]

---

[2] Plaintiffs' amended complaint states that the "Pool Property manager" was Carmel McCarthy from approximately 1988 to 2012, and then from 2012 onwards, McCarthy's daughter Marla DiForte and Marla's husband John DiForte took over the duties of "managing" the Pool Property and communicating with the owners. (Am. Compl., ECF No. 5, ¶ 36.)

Plaintiffs allege that Defendants engaged in a fraudulent scheme, whereby Defendants "contact[ed] former owners, whose shares were known to have been sold to [] new owners who had not recorded their deed," and had "the former owners execute[] a second deed to the Defendant LLC[,] effectively cutting out the new owners[,] including Grigoli and Agoliati[,] of their Pool Property interest[s]." (*Id.* ¶ 69; *see also id.* ¶¶ 151, 161.) Plaintiffs claim that "[a]fter manufacturing fraudulent deeds for the Piccone, Agoliati[,] and Grigoli interests, the Defendant LLC and [its] attorney brought a frivolous State Court partition litigation . . . in order to legally wipe away any remedies that Piccone, Agoliati[,] and Grigoli would have to regain their property." (*Id.* ¶ 70.) Additionally, Plaintiffs bring a claim of conversion and unjust enrichment, alleging that represented Defendants collected Pool Property expenses from several Plaintiffs for years, only to later declare that the Plaintiffs were not owners at all, seemingly without ever returning the parties' payments. (*Id.* ¶¶ 115, 199–202.)

Plaintiffs' amended complaint alleges, *inter alia*, (1) fraud related to three allegedly fraudulent deeds (Counts One through Three); (2) fraud, negligent misrepresentation, and conversion related to Defendants' denying Plaintiffs their possessory rights to the Pool Property (Count Four); (3) civil conspiracy related to the foregoing claims (Count Five); (4) spoliation of evidence (also identified as Count Four); (5) unjust enrichment, based on unreturned payments that Agoliati and Grigoli contributed to the Pool Property expenses (also identified as Count Five); (6) abuse of process, related to the New York partition action (Count Six); (7) breach of fiduciary duty, based on the Defendants' alleged self-dealing and personal conflicts of interest while being in a "fiduciary relationship" with Plaintiffs by virtue of the co-ownership of the Pool Property (Count Seven); (8) breach of the implied covenant of good faith and fair dealing (Count Eight); (9) slander of title, for making "one or more communications

falsely casting doubt on the validity of the plaintiff[s'] title" (Count Nine); and (10) specific performance, whereby Plaintiffs seek to require Defendants "to provide the Plaintiffs[] and each of them with the right of first refusal contained in valid and enforceable deed covenants" (Count Ten). (Am. Compl., ECF No. 5, ¶¶ 170–224.)

## A. State Court Proceedings

In November 2014, Defendant LLC brought a partition action in New York Supreme Court, Richmond County, alleging it owned 7/8ths of the Property, and seeking a sale of the Property to effect an equitable partition. Complaint, *Block 865 Lot 300 LLC v. Baione*, Index No. 101809-2014 (Sup. Ct. Richmond Cnty. Aug. 22, 2018). The court held a "framed-issue hearing to determine who has title to Block 865, Lot 300, a tenancy in common." Decision and Order, *Block 865 Lot 300 LLC v. Baione*, Index No. 101809-2014 (Sup. Ct. Richmond Cnty. Aug. 24, 2018), *available at* ECF No. 8-1. The court traced the Property's ownership dating back to the split in 1966, reviewing 24 deeds and numerous owners. (*Id.* at 2.) The court found that Jerry Grigoli "does not have a valid deed," despite Grigoli's testimony in that proceeding that his interest was conveyed to him by the Mandels in 1988. (*Id.* at 6.) The court similarly found that the Piccones lacked a valid interest in the Property because although Michael and Therese Goldman had deeded a 1/8th interest in the Property to Vincent and Colleen Piccone in 1988, the deed that the Goldmans had purchased (from Dr. Richard Pearlman in 1982) was invalid, as there was no recorded conveyance to Dr. Pearlman "or any evidence of valid title." (*Id.* at 7.) The Richmond County Supreme Court ultimately concluded that "title by a tenancy-in-common to Block 865, Lot 300 is determined as follows: Block 865 Lot 300 LLC, six-eighths; Luke Baione, one-eighth; and Chris Agoliati, one-eighth." (*Id.* at 8.)[3]

---

[3] Luke Baione is not a party to this proceeding.

Following that finding, the parties filed additional motions and appeals in connection with that case. Accordingly, as of this writing, the state court action is not fully concluded.[4]

In addition, on May 18, 2018, a tax foreclosure action was brought in the Supreme Court of the State of New York, Richmond County, to foreclose on the Property based on outstanding tax debts. Complaint, *NYCTL 2017-A Trust v. Block 865 Lot 300 LLC*, Index No. 151247-2018 (Sup. Ct. Richmond Cnty. May 18, 2018), NYSCEF Doc. No. 2. Initially, the defendants in that case defaulted, and the court rendered a judgment of foreclosure and sale; at the auction, Marla DiForte was the highest bidder. *See* J. of Foreclosure & Sale at 2, *NYCTL 2017-A Trust*, Index No. 151247-2018, NYSCEF Doc. No. 44 (noting entry of default judgment); Foreclosure Action Surplus Monies Form, *NYCTL 2017-A Trust*, Index No. 151247-2018, NYSCEF Doc. No. 50 (noting Marla DiForte as purchaser). Chris Agoliati filed an order to show cause, requesting the cancellation of the foreclosure sale, and subsequently paid the outstanding taxes, redeeming the tax lien and judgment. *See* Order to Show Cause, *NYCTL 2017-A Trust*, Index No. 151247-2018, NYSCEF Doc. No. 51; Letter to Court on Redeeming Payment,

---

[4] The subsequent procedural history and the history of the state court appellate proceedings related to the partition action are somewhat lengthy. Of relevance here, as of the time of this writing, the docket sheet for the most recent Appellate Division proceedings indicates that the case is on appeal in the Second Department. As Magistrate Judge Lois Bloom observed in a Report and Recommendation filed in this case on April 20, 2021, a previous appeal related to the partition action was dismissed for failure to perfect the appeal. (*See* R. & R., ECF No. 85, at 2 n.3.) However, the state court records reflect another related appeal, also filed in the Second Department, related to the original partition action. *See* Order, *Block 865 Lot 300 LLC v. Baione,* No. 2022-04498 (N.Y. App. Div. 2d Dep't May 12, 2023). Most recently, on May 12, 2023, the Appellate Division granted Piccone's motion to extend the time to August 1, 2023, for Piccone to perfect the appeal from an order issued on December 21, 2021, by the Supreme Court, Richmond County, regarding his efforts to intervene in the action. *Id.* Additionally, as of the time of the hearing, the parties confirmed that an appeal was still pending related to the state court action. (Tr., ECF No. 151, at 110:6–7.) As of this writing, this appeal is still pending.

*NYCTL 2017-A Trust*, Index No. 151247-2018, NYSCEF Doc. No. 89. As of this writing, this case also does not appear to be fully concluded.

### B. The Parties

Plaintiffs allege that Jerry Grigoli ("Grigoli"), together with Diane Grigoli, purchased their 1/8th share of the Property in 1988. (Am. Compl., ECF No. 5, ¶ 20.) Plaintiff Chris Agoliati ("Agoliati") claims that he "purchased an undivided tenants in common interest in the Pool Property from the acknowledged previous owners" in 1992. (*Id.* ¶ 26.) Plaintiffs also allege that "Dr. Vincent and Colleen Piccone also purchased an undivided 1/8 tenants in common interest in the Pool Property" in 1988, and that during the state court partition action regarding the Property, "Plaintiff Louis A. Piccone acquired an interest in his parents', Dr. and Mrs. Piccone's[,] interest in the Pool Property." (*Id.* ¶¶ 24, 162.)[5]

Plaintiffs further allege that Defendant Carmel McCarthy ("McCarthy") (1) "acted as the real estate broker" when Jerry and Diane Grigoli purchased their interest in 1988; (2) is the mother of Defendant Marla DiForte; and (3) served as the "Pool Property manager" with her sister from at least 1988 until McCarthy's retirement in 2012, when her daughter Marla DiForte and Marla's husband John DiForte took over management duties. (*Id.* ¶¶ 20, 21, 36.) Defendants Marla and John DiForte are alleged to own Defendant LLC, although Plaintiffs aver that others may be members of the LLC

---

[5] The Court notes that Defendant Gross asserts that Plaintiff Piccone's alleged interest in Vincent and Colleen Piccone's share of the Property was a collusive assignment, designed to create federal jurisdiction contrary to 28 U.S.C. § 1359, because Vincent and Colleen are New York citizens and their presence in the case would destroy diversity. (Gross Mem., ECF No. 129, at 11–14, 18–19.) In light of the finding that Piccone has failed to establish his domicile within the United States when the case was commenced, the Court need not reach this issue.

as well. (*Id.* ¶¶ 55, 57.)[6] Defendant Avery Gross ("Gross") is alleged to have acted as an attorney on behalf of Defendants Marla and John DiForte and Defendant LLC during the time periods covered in the amended complaint. (*Id.* ¶¶ 48, 51.) As noted above, the state court partition action concluded that Agoliati and Luke Baione each owned a 1/8th interest in the Property, and Defendant LLC owned the remaining 6/8th interest. Decision and Order at 8, *Block 865 Lot 300 LLC*, Index No. 101809-2014, *available at* ECF No. 8-1.

## II.  Procedural History

Plaintiffs initiated this case by filing a complaint on September 26, 2019, and an amended complaint on November 8, 2019. (Compl., ECF No. 1; Am. Compl., ECF No. 5.) On January 15, 2021, Plaintiff Piccone filed a motion to amend, which the Honorable Louis Bloom recommended denying on April 20, 2021, a recommendation Judge Kuntz adopted on July 27, 2021. (Mot. to Amend, ECF No. 69; R. & R., ECF No. 85; Order Adopting R. & R., ECF No. 109.) On April 22, 2021, the represented Defendants filed a motion to dismiss. (Mot. to Dismiss, ECF No. 86.) On April 26, 2021, Defendant Gross filed a motion to dismiss. (Mot. to Dismiss, ECF No. 87.) On May 19, 2021, Plaintiff Piccone filed a motion for summary judgment. (Mot. for Summ. J., ECF No. 99.)

On December 17, 2021, Judge Kuntz granted Defendants' motions to dismiss. (Order, ECF No. 111.) Judge Kuntz observed that Plaintiffs "were clearly unsatisfied

---

[6] Plaintiffs allege that Defendant Gross represented himself to be a member of Defendant LLC, based on certain writings and representations detailed in the amended complaint. (Am. Compl., ECF No. 5, ¶¶ 125–29.) These allegations are in tension with the Defendant LLC's recently filed Rule 7.1 statement, which represents that Marla DiForte is the sole shareholder in the LLC. (Rule 7.1 Statement, ECF No. 155.) For purposes of the diversity of citizenship analysis, however, even assuming *arguendo* that Gross and John DiForte are members of the LLC as Plaintiffs imply, the LLC would still be a citizen of New York because all alleged members — the DiFortes and Defendant Gross — are citizens of New York. (*See* Compl., ECF No. 1, ¶ 4 (DiFortes); Conclusions of Law, Section I.B.3, *infra* (Gross).)

with [the state court partition] determination and the dismissal of their appeals in the state court, and thus filed their complaint in this diversity action," and concluded that "[b]ecause federal courts cannot act as direct appellate courts to state judgments, this Court lacks jurisdiction to entertain this action." *Id.* at 3; *see also id.* at 4 ("Here, Plaintiffs lost in state court, their requested relief is to be restored fractional shares of the pool property, and any state court judgments were rendered before Plaintiffs initiated the instant action. Therefore, the Rooker-Feldman doctrine applies, and this Court lacks jurisdiction over Plaintiffs' claims.").

On January 7, 2022, Plaintiffs filed a notice of appeal. (Notice of Appeal, ECF No. 113.) Following oral argument, on January 26, 2023, the Second Circuit issued a summary order concerning whether diversity jurisdiction exists in this case. *Agoliati*, 2023 WL 405769. Specifically, the Second Circuit found that "Plaintiffs failed to plead complete diversity for three reasons": (1) "[i]f Piccone, a United States citizen, is domiciled in Canada, his presence in this case destroys diversity," even if Piccone "is a dual United States and Canadian citizen"; (2) Plaintiffs "failed to plead any facts" about Defendant Avery Gross's residence, "which is indispensable to domicile"; and (3) "it is not clear whether the amended complaint satisfies the amount in controversy requirement." *Id.* at *1–2 (quotation marks omitted). The court remanded the case "for the district court to determine whether there is complete diversity of citizenship between Plaintiffs and Defendants and whether each of the Plaintiffs has satisfied the amount-in-controversy requirements of [28 U.S.C.] § 1332 in light of any additional materials the district court permits the parties to submit." (*Id.* at *2.)

On January 26, 2023, Judge Kuntz referred this case to the undersigned Magistrate Judge for "additional findings of fact regarding (1) the citizenship and domiciles of the parties and (2) whether each Plaintiff has satisfied the amount-in-

controversy requirements of § 1332." (Order, ECF No. 117.) Following the referral, the Court held a telephonic status conference, and scheduled the evidentiary hearing for May 11, 2023. (Mar. 2, 2023 ECF Min. Entry & Order.) In addition, the Court directed the parties to file supplemental briefing on ECF, and to submit anticipated witness and exhibit lists in advance of the hearing. (*Id.*)[7]

On May 11, 2023, the Court held the in-person evidentiary hearing, with Plaintiff Grigoli participating by telephone due to his medical circumstances. (May 11, 2023 ECF Min. Entry & Order; Tr., ECF No. 151, at 1:15–20.)[8] Also on May 11, 2023, Plaintiff Agoliati filed on ECF the evidence he sought to introduce at the evidentiary hearing.

---

[7] Following the Court's order scheduling the hearing, Plaintiff Grigoli submitted a letter on March 24, 2023, listing the expenses he has paid for the Pool Property over the past thirty-six years. (Grigoli Ltr., ECF No. 123.) In addition, Plaintiffs Agoliati and Piccone, the represented Defendants and Defendant Gross each made pre-hearing filings. (Agoliati Ltr., ECF No. 124; Piccone Submission, ECF No. 125; Gross Mem., ECF No. 129; Represented Defs.' Mem., ECF No. 130.) Piccone also filed a letter seeking clarification on whether his brief was to "include a section on domicile." (Piccone Ltr., ECF No. 126.) Between these filings and the scheduled hearing, counsel for Plaintiff Agoliati filed a motion to withdraw, on consent, and Plaintiff Grigoli advised the Court that he was suffering from health issues that could prevent his in-person attendance at the evidentiary hearing; the Court held a conference to address these issues on May 3, 2023. (Mot. to Withdraw, ECF No. 131; Grigoli Mot. to Appear by Telephone, ECF No. 136; May 3, 2023 ECF Min. Entry & Order.) After the conference, Plaintiff Piccone submitted an exhibit and witness list, and Defendants submitted their respective exhibit lists. (Piccone Ex. & Witness List, ECF No. 139; Gross Ex. List, ECF No. 137; Represented Defs.' Ex. List, ECF No. 138.) On May 5, 2023, Plaintiff Grigoli submitted a letter to the Court regarding his participation in the evidentiary hearing remotely, due to his personal medical circumstances. (Grigoli Ltr., ECF No. 140.) On May 9, 2023, the Court held another telephonic status conference to discuss the evidentiary hearing. (May 9, 2023 ECF Min. Entry & Order.) On May 10, 2023, Plaintiff Piccone submitted a declaration and proposed exhibits on ECF. (Piccone Decl., ECF No. 142.)

[8] Plaintiff Grigoli was granted permission from the Court to attend the hearing remotely (via audio only) due to personal health circumstances. (Grigoli Mot. to Appear by Telephone, ECF No. 136; May 3, 2023 ECF Min. Entry & Order ("*Pro se* Plaintiff Jerome 'Jerry' Grigoli's Motion to Appear by Telephone/Video ([ECF No.] 136) is granted, in part, insofar as Mr. Grigoli is **not** required to attend the Evidentiary Hearing in person."); May 9, 2023 ECF Min. Entry & Order ("Plaintiff Grigoli consented on the record to partial participation in the evidentiary hearing via audio only . . . .").)

(Agoliati Exs., ECF No. 143.)[9] After the evidentiary hearing, the parties submitted post-hearing briefs and some parties submitted responses. (*See* Gross Post-Hearing Br., ECF No. 144; Represented Defs.' Post-Hearing Br., ECF No. 145; Piccone Post-Hearing Br., ECF No. 146; Agoliati Post-Hearing Br., ECF No. 147; Agoliati Resp. to Represented Defs., ECF No. 149; Agoliati Resp. to Gross, ECF No. 150; Piccone Resp., ECF No. 154.)

On September 28, 2023, the Court ordered Defendant LLC to submit a disclosure statement pursuant to Federal Rule of Civil Procedure 7.1. (Sept. 28, 2023 ECF Order.) The next day, Defendant LLC submitted a Rule 7.1 disclosure statement, indicating its sole member has been Marla DiForte since its inception, and asserting that Ms. DiForte "is and always has been a citizen of the United States and a resident of the State of New York." (Rule 7.1 Statement, ECF No. 155.)

## FINDINGS OF FACT

At the evidentiary hearing, the parties testified regarding several topics, including their domicile and citizenship, damages (including the valuation of the pool property and past expenses), and sought to introduce some evidence regarding Defendants' alleged fraud.[10]

---

[9] Although most of the exhibits Agoliati offered at the evidentiary hearing were included in his ECF filing (ECF No. 143), for his last exhibit (Agoliati Ex. 7), Agoliati offered a fourteen-page packet of documents at the hearing, while his ECF filing contained only the first five pages of Agoliati Exhibit 7. One document admitted at the hearing as part of Agoliati Exhibit 7, the "Notice of Property Value" from the N.Y.C. Department of Finance, is reproduced as Appendix 2.

[10] A more comprehensive list of the exhibits admitted at the evidentiary hearing is included in the attached Appendix 1. Many of the exhibits are not directly relevant to the issues presently before the Court, but were admitted at the hearing for expediency and in light of the *pro se* status of many of the parties.

## I.  Witness Plaintiff Chris Agoliati

Plaintiff Agoliati testified that at all times relevant to this case, he was a resident of New Jersey and intends to remain there. (Tr., ECF No. 151, at 74:11–14.) Agoliati also offered the following exhibits to establish his New Jersey residence: (1) a photocopy of the front of his expired New Jersey's driver's license, indicating an address in Towaco, New Jersey, issued on April 3, 2018, with an expiration date of March 31, 2022, (Agoliati Exs., ECF No. 143, at ECF p. 2); (2) a photocopy of the front of his current New Jersey driver's license, indicating an address in Montville, New Jersey, issued on December 13, 2022, with an expiration date of November 3, 2026, (*id.* at ECF p. 3); (3) several envelopes and letters addressed to him at a Sea Girt, New Jersey address, (*id.* at ECF pp. 22–23, 25); and (4) several checks from Agoliati, listing his address in Spring Lake, New Jersey, along with more letters and envelopes addressed to Agoliati at his Sea Girt, New Jersey address, (*id.* at ECF pp. 27–34, 36–37, 41). In addition to the evidence regarding his residence, Agoliati offered evidence regarding expenses he had paid relating to the Pool Property over the years and other documents.[11]

Agoliati also offered evidence related to his purchase and ownership of 1/8th of the Pool Property, and the value of the Property. As to ownership, he offered a photocopy of the front of a money order dated August 18, 1992, for $1,000, made payable to Leonard and Barbara Dusold, and a photocopy of the front of a cashier's

---

[11] (*See* App. 1 (Agoliati Exs. 4–7).) As discussed *infra*, to evaluate whether Plaintiffs have adequately alleged the requisite amount in controversy, the Court primarily relies upon the allegations in the amended complaint related to Plaintiffs' claims of Defendants' alleged deprivation of the right of first refusal. Evidence regarding specific expenses Plaintiffs claimed to have paid or incurred, which is most relevant to an evaluation of the possible damages for Plaintiffs' other claims, such as unjust enrichment and abuse of process, is less relevant to the Court's evaluation of whether there is a legal certainty that Plaintiffs' claims are "really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289 (1938).

check made out to Leonard and Barbara Dusold for $8,000, dated August 17, 1992. (*Id.* at ECF p. 51.) Agoliati also offered a two-page document entitled "April 2011–May 2012 Pool Statement," that indicated: "Five shares paid [for] Diforte, Baione, McCarthy (3)" and "Three shares not paid [for] Grigoli, Piccone, Agoliati (1/2)." (*Id.* at ECF p. 38.)

Regarding the value of the Pool Property, Agoliati offered as an exhibit a "Notice of Property Value" from the N.Y.C. Department of Finance for the Property, dated January 15, 2015, indicating that the market value for the 2016–2017 tax year was $584,000. (App. 2.)[12]

## II. Witness Plaintiff Louis Piccone

Regarding diversity jurisdiction, Plaintiff Louis Piccone (who, although acting *pro se*, is a trained attorney) testified as follows: "I'm here to establish my domicile in Massachusetts at the time of the filing date of the complaint in this matter as well as to establish that the Piccone damages independently exceed[] $75,000 in this case." (Tr., ECF No. 151, at 98:1–4.) As to his residence, Piccone testified that he moved to Massachusetts in 2004 or 2005, and that he had owned property there "continuously since 2005." (*Id.* at 101:9–10, 102:10–12.) He also testified that he moved to Canada in 2010. (*Id.* at 115:24, 118:11–12.)

---

[12] During cross-examination, counsel appeared to be seeking to establish that Agoliati could not recover in this case for loss of his share, because the state court has already concluded that he is the owner of 1/8th of the Pool Property. Specifically, counsel asked: "You're suing for a value, [your] one-eighth share that you own. How did you lose the value of your one-eighth share, you own it?" and Agoliati replied: "I had no problem owning this property." (Tr., ECF No. 151, at 84:11–14.) Counsel went on to ask, "You are suing, therefore, for the harassment and the stress and the costs and the attorney's fees of somebody attempting to steal your share, correct?" and Agoliati replied: "All of the above." (*Id.* at 84:24–85:3.) Agoliati was asked, "your claim for damages here . . . really is your incidental expenses to prove that you are a one-eighth owner in the state court litigation, correct?" and he replied: "it's all part of it," indicating his claims in state and federal court. (*Id.* at 88:15–19.) On recross, counsel for represented Defendants asked Agoliati, "Does the deed [to the Pool Property] itself have your name on it?" to which Agoliati replied: "No." (*Id.* at 96:2–4.) In evaluating the amount in controversy here, as discussed *infra*, the Court looks to the face of the amended complaint.

Regarding his ties to Massachusetts, Piccone testified that he was "registered . . . as a Massachusetts voter since I believe 2005 through about 2016 when they took my name off the rolls for some reason," and that he renewed his voter registration in 2017 or 2018, and believes that he was registered to vote in Massachusetts at the time the complaint was filed. (*Id.* at 102:15–23.) Additionally, Piccone testified that he has "voted almost continuously from 2005 through the present in Massachusetts," voting in person, besides "during COVID"; he stated he did not request an absentee ballot. (*Id.* at 103:4–15.) As to which elections he voted in, Piccone testified that he "voted in the presidential elections." (*Id.* at 103:7–8.) Additionally, Piccone testified that he is a dual citizen of the United States and Canada, and that he voted in the last Canadian election, at the encouragement of a friend. (*Id.* at 136:14–19.)

By way of documentary evidence, Piccone offered a deed and mortgage to his and his wife's Dalton, Massachusetts property. (Piccone Decl., Exs. 1–2, ECF No. 142, at ECF pp. 5–8 (deed), 10–29 (mortgage).) Piccone Exhibit 3 consisted of a printout from the Massachusetts Secretary of State website, printed on May 9, 2023, indicating his voting status as "active" and listing his Dalton, Massachusetts property address. (*Id.*, Ex. 3, at ECF pp. 31–32.) Piccone Exhibit 5 consisted of a printout from Mass.gov, indicating several suspensions of his Massachusetts driver's license. (*Id.*, Ex. 5, at ECF pp. 36–38.)

Regarding his driver's license, Piccone first asserted that his Massachusetts driver's license was "active from 2014 at least through December of 2022," asserting that the Mass.gov printout established that fact. (Tr., ECF No. 151, at 103:21–104:4.) In response to questioning by the Court, however, regarding whether the document established that time frame, given that the document indicated that Piccone's Massachusetts license was suspended "from 7th of July 2013 to indefinite," Piccone

13

testified that he was not certain whether his Massachusetts license was ever restored after the 2013 suspension. (*Id.* at 104:7–10, 25; *see also* Piccone Decl., Ex. 5, ECF No. 142, at ECF pp. 36–38.) Notably, Piccone did not produce a driver's license at the hearing, and his testimony did not clearly establish whether he has a valid driver's license from any state. (Tr., ECF No. 151, at 104:25; *id.* at 132:8–13 (Q: "And do you have a valid driver's license issued by any state?" A: "I'm not sure. . . . I believe I have a valid Florida driver's license at present entitling me to drive."); *id.* at 132:24–133:1 (confirming that he drove to New York from Canada for the evidentiary hearing without a driver's license in his possession).)

As to his intentions to return to Massachusetts, Piccone testified that "at the time of the filing of the complaint, I intended to move back to Massachusetts at some point although I did not currently, at that time, reside in Massachusetts." (*Id.* at 105:19–22.) Piccone also testified that he had filed a 2019 tax return in Massachusetts, but did not provide any documentary evidence to substantiate that claim. (*Id.* at 135:2–3.) Piccone testified that he had credit cards in 2019, and that the bills went to his address in Canada. (*Id.* at 136:1–4.) On cross-examination, Piccone testified that "[i]n 2019, I lived primarily in Hawkesbury, Ontario, Canada" with his wife and children. (*Id.* at 114:14–18.) When the Court asked Piccone to clarify if he worked in Canada in 2019, Piccone replied: "No, I don't believe I did. . . . I don't recall — I might have. . . . I don't remember specifically what I was doing in 2019 in terms of my work in Canada. But I probably did . . . miscellaneous things to generate de minimis amounts of money usually." (*Id.* at 115:2–12.) When the Court asked Piccone what work he did in 2019, he testified that he had short term positions ("day jobs") in New York, Pennsylvania, Ontario, and Quebec. (*Id.* at 133:8–134:6.) Piccone also testified that the car he used to

14

travel to jobs in 2019 was his wife's car, which was registered in Ontario. (*Id.* at 135:14–19.)

When Piccone was asked, "you did not live or reside in Massachusetts at the time of the initiation of this lawsuit, correct?" he replied: "That's correct." (*Id.* at 115:15–18.) Piccone further stated: "I moved to Canada in maybe 2010. But it was always my intent to go back — well, I shouldn't even say that, because of the circumstances[,] I didn't intend to go back for a long time. But then I did because our house in Massachusetts is quite nice." (*Id.* at 115:24–116:3.) In regard to the "circumstances" that had disincentivized Piccone from returning to Massachusetts, he testified that: "I was harassed by governmental authorities to the point where my wife no longer wanted to live in Massachusetts," harassment which occurred in January 2008 and has been "ongoing since then." (*Id.* at 116:6–11.) Piccone stated that he has lived at his Dalton, Massachusetts property "off and on for various reasons," noting that for work reasons, "I lived there for a month at one point. I don't remember what year it was." (*Id.* at 116:16–20.) When counsel for represented Defendants asked, "when you stayed at that house for that month for the project, was it your intention to return to Canada to live with your family?" Piccone replied: "Yes." (*Id.* at 116:24–117:2.) When counsel asked, "your intention is to return to Massachusetts when and if the circumstances allow, correct?" he replied: "Correct." (*Id.* at 117:16–18.)

Piccone also confirmed that he listed his Ontario, Canada address when filing the federal complaint. (*Id.* at 118:2–5.) Piccone further testified that "[r]ecently, my wife has gotten tired of the cold in Canada so she's reapplied for her American naturalization, okay. So she wants to potentially come back to the United States. . . . So my intent was at that time — it's no longer my intent now — but it was at the time the complaint was filed to go back to Massachusetts." (*Id.* at 119:17–23.) When Piccone was asked, "you

told the panel of the Second Circuit that you essentially . . . claim to be a resident in

Florida, correct?" he replied: "That's correct." (*Id.* at 132:18–21.)

In an apparent effort to establish the amount in controversy, Piccone testified

that he believed the state court litigation, which undergirds Plaintiffs' abuse of process

claim, was frivolous and brought in bad faith. (*Id.* at 106:17–23, 107:4–12, 17–18, 109:6–

7.) As to Defendants' alleged fraudulent scheme, Piccone stated that Defendants

intentionally did not pay the taxes for the Property "so that the property would be

taken by the City in foreclosure and then [Defendants] instigated a tax foreclosure

action." (*Id.* at 108:13–15.) Piccone stated that he estimates, based on phone bills, that he

has spent almost 2,000 hours on "this litigation," presumably including both the state

and federal court actions. (*Id.* at 109:15–20.) Piccone also testified that he has spent "well

in excess of 1,500 hours in this matter," and that "the way that the defendants have

conducted the litigation has aggravated several medical conditions that I have." (*Id.* at

112:22–23, 113:3–5.)

As to Plaintiffs' unjust enrichment claim, Piccone testified that "[D]efendants

billed [Plaintiffs] for 30 years for this property every year, taxes, special assessments,

maintenance fees," only to state in 2008 that some Plaintiffs were not owners of the

Property. (*Id.* at 110:8–14.) Piccone later testified that "the expenses for the property

were approximately a thousand dollars a year from 1988 through 2008 when my

parents stopped paying," indicating his parents were the ones paying the Property

expenses through 2008. (*Id.* at 123:12–15.) Piccone stated he could testify from personal

knowledge as to these payments because he was a part of his parents' household

"through much of that period of time," and that he saw "at least maybe four checks."

(*Id.* at 124:7–23.)

Based on a "right of first refusal" theory, Piccone testified that combining the value of at least three shares as to which Plaintiffs alleged they were denied a right of first refusal, Plaintiffs' claim would be worth over $200,000, well in excess of the amount-in-controversy requirement. (*Id.* at 111:20–112:6.) This valuation is corroborated by the City of New York's valuation of the property at $584,000. (App. 2.) As discussed above, based on this estimate, a 1/8th share would be valued at $73,000, while three shares would be valued at approximately $219,000. ($73,000 x 3 = $219,000.)

As to Plaintiffs' fraud claim, Piccone testified:

> [D]efendants knew that these properties were not owned by the grantors [who sold their shares of the Property to Defendant LLC], who Mr. Gross prepared the deeds for. Mr. Gross had actual and explicit knowledge. He describes it in his correspondence to the grantors who told him, "we don't own it any more." And nevertheless, he threatened litigation against them if they didn't sign the deeds, and then he recorded deeds when he had actual knowledge of who the real owners were. The real owners didn't record their deeds in some instances at the defendants' request because they said "it's going to make it easier to resolve at some later point."

(*Id.* at 110:19–111:4.)

On cross-examination, counsel for represented Defendants asked: "One [of] the things you stated was that the defendants are liable for unjust enrichment, correct?" to which Piccone replied: "Correct." (*Id.* at 121:23–25.) Counsel for represented Defendants continued as follows: "They collected fees from your parents and you're seeking reimbursement of those fees, that's one of the claims of the unjust enrichment, correct?" to which Piccone again replied: "Correct." (*Id.* at 122:2–6.)

## III. Witness Defendant Avery Gross

Gross testified regarding his domicile and citizenship. Gross testified that he has lived in Staten Island, New York, for "[a]lmost all of my life," and that he has lived at his current residence in Staten Island "continuously since 1965." (*Id.* at 140:11–14, 21–24.) Gross stated that he and his wife owned his Staten Island residence until it was

transferred to his daughter and son-in-law at some point in the 1990s. (*Id.* at 141:2–142:2.) Gross testified that he is registered to vote in Richmond County, New York, and usually votes in person. (*Id.* at 142:3–14.) He stated that in 2019, he was self-employed as a sole practitioner attorney in Staten Island, and that he filed taxes with New York State and New York City. (*Id.* at 142:15–143:2.) Gross testified that he has had his Staten Island office for at least sixty years. (*Id.* at 146:7–12.) Gross also testified that he has a New York driver's license, and that he drives his daughter's vehicle, which has New York license plates. (*Id.* at 143:3–23.) He stated that he banks with banking institutions on Staten Island. (*Id.* at 146:16–23.)

Gross also testified that his wife lives in Jerusalem, Israel, and has lived there continuously for approximately 30 years. (*Id.* at 144:12–14, 145:15–19.) He stated that seven of his nine children also currently live in Israel. (*Id.* at 145:5–14.) Gross testified that currently (and also in 2019), he spends about half of his time in Israel. (*Id.* at 145:20–24.) When the Court asked, "[w]hen you visit Israel, is it your intention to return to the United States?" he replied: "Yes, and I always do at least once a month." (*Id.* at 145:25–146:6.) Gross further testified that he owns a residential property in Israel that is rented out. (*Id.* at 150:1–17.) Gross stated that he is not registered to vote in Israel, is not a member of any social club in Israel, does not have an Israeli driver's license, and has no bank accounts in Israel. (*Id.* at 150:23–151:8.)

## CONCLUSIONS OF LAW

### I. Diversity Jurisdiction

#### A. Legal Standard

As courts of limited jurisdiction, federal courts are obligated to "determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). Federal courts have original

jurisdiction when a "federal question" is presented, 28 U.S.C. § 1331, or when there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, *id.* § 1332. "If subject matter jurisdiction is lacking, the action must be dismissed." *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700–01 (2d Cir. 2000); *see also* Fed. R. Civ. P. 12(h)(3). Diversity jurisdiction requires "complete diversity"; that is, the citizenship of each plaintiff must be diverse from the citizenship of each defendant. *Platinum-Montaur Life Scis., LLC v. Navidea Biopharms., Inc.*, 943 F.3d 613, 617 (2d Cir. 2019) (citing *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 388 (1998)). "In an action in which jurisdiction is premised on diversity of citizenship, diversity must exist at the time the action is commenced . . . ." *Universal Licensing Corp. v. Paola del Lungo S.P.A.*, 293 F.3d 579, 581 (2d Cir. 2002).

A person's citizenship is determined by their domicile. *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 53 (2d Cir. 2019) (quotation marks omitted). The Second Circuit has described domicile as "the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000) (quotation marks omitted). To identify a party's domicile, the Court must look to two indispensable criteria: (1) the party's residence in the state, and (2) the intent to remain in the state indefinitely. *See Pacho v. Enterprise Rent-A-Car*, 510 F. Supp. 2d 331, 333 (S.D.N.Y. 2007) (citing *Palazzo*, 232 F.3d at 42); *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). Importantly, domicile is not synonymous with residence. *Holyfield*, 490 U.S. at 48. Although a party may have multiple residences, they can only have one domicile at any given time. *Dukes v. N.Y.C. Emps.' Ret. Sys.*, 361 F. Supp. 3d 358, 367 (S.D.N.Y. 2019).

In order for an individual to be found to be a citizen of a state for purposes of diversity jurisdiction, "a natural person must both be a citizen of the United States *and* be domiciled within the State." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989) (emphasis in original). If a party has multiple residences, a court must look to where the party has the intention of remaining indefinitely. *Suedrohrbau Saudi Co. v. Bazzi*, No. 19-CV-5130 (EK) (LB), 2021 WL 4065523, at *3 (E.D.N.Y. Sept. 7, 2021) (citing *Gutierrez v. Fox*, 966 F. Supp. 214, 217 (S.D.N.Y. 1997)). Although one component of domicile is the party's intent, their stated intent is not conclusive. *Nat'l Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1227–28 (S.D.N.Y. 1991) ("The party's own statements concerning his intentions are relevant, but they are of slight weight when they come into conflict with other facts that tend to disclose a contrary intent."); *Levy v. Suissa*, No. 16-CV-2532 (EK) (ARL), 2021 WL 2402240, at *6 (E.D.N.Y. Mar. 19, 2021); *Korn v. Korn*, 398 F.2d 689, 691 (3d Cir. 1968) ("One's testimony as to his intention to establish a domicile, while entitled to full and fair consideration, is subject to the infirmity of any self-serving declaration, and it cannot prevail to establish domicile when it is contradicted . . . by an inconsistent course of conduct; otherwise stated, actions speak louder than words.").

To ascertain domicile, a court should examine the entire course of a person's conduct to draw inferences as to the party's relevant intent. *Suedrohrbau Saudi Co.*, 2021 WL 4065523, at *3. Pertinent criteria in making such a determination can include, among other factors, the party's current residence, place of employment, voter registration, place of filing tax returns, location of spouse and family, property ownership, driver's license, car registration, and bank account location. *Levy*, 2021 WL 2402240, at *3;

*Gutierrez*, 966 F. Supp. at 217.[13] However, a court must look at the "totality of the evidence," and keep in mind that no single factor is conclusive. *Gutierrez*, 966 F. Supp. at 217.

As to who bears the burden of proof, it is well established that the "party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist and that diversity is complete." *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 160 (2d Cir. 1998). This is true even where, as in this case, "the allegation of diversity relies on old domiciles and the denial of diversity relies on changes in domicile." *Herrick Co. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 323 (2d Cir. 2001). Accordingly, in this case, Plaintiffs have the burden of persuasion to "establish actual initial, diverse, domestic domiciles." *Id.* at 324.

United States citizens who are domiciled abroad are not considered citizens of a state, and therefore cannot confer diversity jurisdiction in federal court. *Id.* at 322. Because they are "neither citizens of any state of the United States nor citizens or subjects of a foreign state," § 1332(a) does not confer federal jurisdiction over a suit in which such persons are parties. *Id.* (quoting *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 68 (2d Cir. 1990)). Even for those who are dual citizens of the United States and another country, the Second Circuit has held that "only the American nationality of the dual citizen should be recognized under 28 U.S.C. § 1332(a)." *Action S.A. v. Marc Rich & Co.*,

---

[13] Courts have historically observed a rebuttable presumption that a married person is domiciled where their spouse lives. *Banister v. Solomon,* 126 F.2d 740, 742 (2d Cir. 1942) ("As they were living together as man and wife, [the defendant's] domicil[e] and residence were the same as her husband's."); *Broadstone Realty Corp. v. Evans*, 213 F. Supp. 261, 265 (S.D.N.Y. 1962), *dismissed on the merits*, 251 F. Supp. 58 (S.D.N.Y. 1966), *aff'd per curiam*, 367 F.2d 397 (2d Cir. 1966) ("[A] married man's domicile is presumed to be where his wife and family reside, if that is at a permanent home, and there is no proof of separation."). *But see Holley v. Techtronic Indus. N. Am., Inc.,* No. 16-CV-05475 (WHO), 2016 WL 7474811, at *3 (N.D. Cal. Dec. 29, 2016) ("The parties have not cited to and I am not aware of any modern decisions treating the location of a party's spouse, without more, as prima facie evidence of domicile . . . .").

951 F.2d 504, 507 (2d Cir. 1991) (quoting *Sadat v. Mertes*, 615 F.2d 1176, 1187 (7th Cir. 1980)).

Finally, for diversity purposes, it is well established that a limited liability company ("LLC") takes on the citizenship of each of its members. *Platinum-Montaur Life Scis., LLC v. Navidea Biopharms., Inc.*, 943 F.3d 613, 615 (2d Cir. 2019).

### B. Analysis

As set forth above, the Second Circuit directed the Court to determine "whether there is complete diversity of citizenship between the Plaintiffs and Defendants and whether each of the Plaintiffs has satisfied the amount-in-controversy requirements of § 1332." *Agoliati*, 2023 WL 405769. As a threshold matter, the Court notes that there appears to be no dispute that, at the time the complaints were filed, Plaintiff Jerry Grigoli's citizenship was in New Jersey, while Defendants John DiForte, Marla DiForte, and Carmel McCarthy's citizenships were in New York. (Compl., ECF No. 1, ¶¶ 4 (DiFortes), 5 (McCarthy); Am. Compl., ECF No. 5, ¶¶ 3 (Grigoli), 6 (DiFortes), 7 (McCarthy); Represented Defs.' Am. Answer, ECF No. 14, ¶ 4 (admitting ¶¶ 6–7 of the Amended Complaint); Gross Answer, ECF No. 17, ¶ 4 (admitting ¶¶ 6–7 of the Amended Complaint).) Based on the evidence adduced at the hearing, as to Plaintiffs Agoliati and Piccone, and Defendant Gross, the Court finds as follows.

### 1. *Plaintiff Louis Piccone Was Domiciled in Canada*

As set forth above, at the evidentiary hearing, Plaintiff Piccone sought to establish that he was a domiciliary of Massachusetts at the time the amended complaint was filed.[14] Piccone testified that (1) he has owned the Dalton, Massachusetts property

---

[14] Although the relevant inquiry for purposes of diversity jurisdiction is an individual's domicile at the time the action was commenced (here, the initial complaint was filed on September 26, 2019), Piccone was not a party to the action until the amended complaint was

continuously since 2005; (2) he renewed his Massachusetts voter registration in 2017 or 2018 and believed he was registered to vote in Massachusetts at the time the amended complaint was filed; (3) he filed a Massachusetts tax return in 2019; and (4) his intent, in 2019, was to move back to Massachusetts. (Tr., ECF No. 151, at 102:11–12, 15–23, 105:19–22, 135:2–3 ("[A]t the time of the filing of the complaint, I intended to move back to Massachusetts at some point although I did not currently, at that time, reside in Massachusetts.").) Piccone also submitted the deed and mortgage to his and his wife's Dalton, Massachusetts property. (Piccone Decl., Ex. 1–2, ECF No. 142, at ECF pp. 5–8, 10–29; Tr., ECF No. 151, at 101:2–5, 101:9–18.)[15]

The Court also notes that during oral argument before the Second Circuit, Piccone stated that he had driven from Canada to attend the January 2023 oral argument and claimed to be a resident of Florida. (Oral Argument at 1:29, 1:58, 2:57, *Agoliati*, No. 22-51 (2d Cir. Jan. 26, 2023) (Piccone: "With regard to diversity jurisdiction, my residence [has] been in Canada for many years now." Second Circuit: "Your primary residence is in Canada?" Piccone: "Yes." Piccone: "I would argue, Your Honor, that as a Florida resident with a Florida driver's license, if my home state would be Florida, then there would be diversity of jurisdiction."); (*see also* Tr., ECF No. 151, at 132:18–23 (Represented Defendants' Counsel: "That's what you told the panel of the Second Circuit[,] that you essentially . . . claim to be a resident in Florida, correct?" Piccone: "That's correct.").)

---

filed on November 8, 2019. The Court accordingly analyzes Piccone's domicile at the time he joined this litigation.

[15] Piccone submitted other documents at the evidentiary hearing, as noted in the attached Appendix 1, but many of these documents lacked authentication, or were not directly probative as to Piccone's domicile at the relevant time, i.e., when the amended complaint was filed in November 2019.

Evaluating the totality of the evidence, several statements and documents lead to the conclusion that, at the time this action was commenced, Piccone was domiciled in Canada. The Court first notes that nearly all (if not all) documents in the record filed by Piccone list his address as Ontario, Canada.[16] Although Piccone testified at the hearing that it was his intent to return to Massachusetts, his testimony was ambiguous as to timing, and lacked sufficient specifics to establish meaningful ties to Massachusetts in 2019, when this lawsuit began. For example, Piccone testified: "I moved to Canada in maybe 2010. But it was always my intent to go back — well, I shouldn't even say that, because of the circumstances I didn't intend to go back for a long time. But then I did because our house in Massachusetts is quite nice." (Tr., ECF No. 151, at 115:24–116:3.) Piccone also stated that, "at the time of the filing of the complaint, I intended to move back to Massachusetts at some point although I did not currently, at that time, reside in Massachusetts." (Tr., ECF No. 151, at 105:19–22.) Specifically, Piccone agreed that he intended to return to Massachusetts "when and if the circumstances allow," suggesting they could return when he and his wife no longer feared harassment from Massachusetts governmental authorities. (*Id.* at 116:6–11,117:15–18.) Piccone also stated:

---

[16] Piccone's ECF filings from 2019 and 2020 illustrate that he used his Ontario address exclusively at the time this case was initiated. (*See, e.g.*, Am. Compl., ECF No. 5, at ¶ 4 (Nov. 8, 2019); Mot. for Entry of Default, ECF No. 11, at ECF p. 8 (Jan. 30, 2020); Pls.' Reply, ECF No. 16, at ECF p. 6 (Feb. 19, 2020); Mot. to Compel, ECF No. 21, at ECF p. 42 (Apr. 1, 2020); Mot. to Compel, ECF No. 24, at ECF p. 18 (Apr. 7, 2020); Mot. for Protective Order, ECF No. 28, at ECF pp. 15, 32 (July 9, 2020); Piccone Ltr., ECF No. 115, at ECF pp. 1, 4, 15 (July 31, 2020); Mot. for Extension of Time to File, ECF No. 36, at ECF p. 1 (indicating Piccone's Ontario address within the letter, but listing Agoliati's Montville, NJ P.O. box as the return address on the attached scanned envelope) (Aug. 18, 2020); Status Report, ECF No. 43, at ECF p. 1 (Sept. 21, 2020); Mot. for Recons., ECF No. 44, at ECF p. 1 (Sept. 24, 2020); Mot. for Recons., ECF No. 45, at ECF p. 1 (Sept. 24, 2020); Reply in Opp'n, ECF No. 48, at ECF p. 4 (Sept. 29, 2020); Reply in Opp'n, ECF No. 49, at ECF p. 6 (Oct. 2, 2020); Mot. for Extension of Time to File, ECF No. 54, at ECF p. 1 (Oct. 8, 2020); Piccone Ltr., ECF No. 55, at ECF p. 1 (Oct. 12, 2020); Piccone Ltr., ECF No. 56, at ECF p. 1 (Oct. 11, 2020); Piccone Emergency Mot., ECF No. 61, at ECF p. 1 (Dec. 2, 2020); Piccone Resp. to Disc., ECF No. 64, at ECF p. 1 (Dec. 11, 2020); Mot. for Pre-Mot. Conference, ECF No. 68, at ECF p. 1 (Dec. 16, 2020).)

"my intent was at that time — it's no longer my intent now — but it was at the time the complaint was filed to go back to Massachusetts." (*Id.* at 119:21–23.) Piccone additionally testified that his credit card bills in 2019 went to his Canada address, that the car he was using to travel to jobs in 2019 (his wife's car) was registered in Ontario, and that he voted in the last Canadian election. (*Id.* at 135:14–19, 136:1–4, 14–16.)

The evidence at the hearing established that Piccone (1) purchased the Massachusetts house in 2005, (2) moved to Canada to live with his wife and children in 2010, and (3) to date, thirteen years later, he continues to reside in Canada. Notably, he offered no specific testimonial or documentary evidence to establish his physical presence in Massachusetts at any point during 2019; he likewise did not produce proof that he filed a 2019 state tax return, as he claims. Noting that statements of intent to reside are not conclusive, *Connolly v. Spielman*, 999 F. Supp. 270, 272 (N.D.N.Y. 1998), and considering the "totality of the evidence," *Gutierrez*, 966 F. Supp. at 217, the Court has little difficulty concluding that at the time the amended complaint was filed in November 2019, Piccone was domiciled in Canada. Although the record contains factual support for the contention that Piccone intended to maintain his home in Massachusetts and return there one day, numerous indicators suggest he took up domicile in Canada in 2010 when he moved there, and that Ontario became "his true fixed home and principal establishment," not Massachusetts. *Palazzo*, 232 F.3d at 42. In reaching this conclusion, the Court is particularly persuaded by Piccone's own testimony that his intention to return to Massachusetts had no definite time frame. (Tr., ECF No. 151, at 115:25–116:11, 119:8–23.)

This is a case where Plaintiff Piccone's actions regarding his residence and domicile speak far louder than his words. *See Korn*, 398 F.2d at 691. Based on the evidence presented at the hearing, Piccone has failed to establish either his physical

presence in Massachusetts in 2019 or his intent to remain there indefinitely. *Palazzo*, 232 F.3d at 42. Accordingly, at the time this lawsuit began, Piccone was a United States citizen domiciled abroad; his presence in this case destroys diversity jurisdiction. *Herrick Co.*, 251 F.3d at 322.

　　2.　*Plaintiff Chris Agoliati Was Domiciled in New Jersey*

The Court notes that the complaints allege Agoliati's domicile as New Jersey. (Compl., ECF No. 1, ¶ 2; Am. Compl., ECF No. 5, ¶ 3.) It appears that Defendant Gross is the only one attempting to challenge this assertion. (Represented Defs.' Mem., ECF No. 130, at ECF p. 4 ("It is conceded by these defendants that plaintiff Agoliati was a resident and domiciliary of New Jersey at the time of the filing of the complaint, as we are not in possession of any evidence to the contrary."); Tr., ECF No. 151, at 6:12–17 (Agoliati stating that Defendant Gross objected to Agoliati's domicile); Gross Post-Hearing Br., ECF No. 144, at 2 (suggesting, without any additional evidence, that Agoliati may have been a domiciliary of New York because of his New York real estate broker's license).)

In support of Agoliati's contention that he was domiciled in New Jersey at the time the complaint was filed, the Court credits evidence submitted regarding his prior New Jersey driver's license, valid from 2018 to 2022, and his testimony at the hearing. (Agoliati Exs., ECF No. 143, at ECF p. 2; Tr., ECF No. 151, at 6:18–20.) As set forth above, Agoliati testified that he was a resident of New Jersey, and has intended to remain there permanently, from 2012 through the present. (*Id.* at 74:9–14.) There is no evidence that meaningfully contradicts Agoliati's sworn testimony and evidence. Therefore, the Court concludes that Agoliati was domiciled in New Jersey when this case was initiated.

3.   *Defendant Avery Gross Was Domiciled in New York*

Gross testified that he has lived in Staten Island, New York, for almost all of his life, that he has lived at his current residence in New York since 1965, and that he has had his Staten Island office for at least sixty years. (Tr., ECF No. 151, at 140:11–14, 21–24, 146:7–12, 146:16–23.) He further testified that he is registered to vote in New York, does vote in New York, has a New York driver's license, drives a car with New York plates, and banks in New York. (*Id.* at 142:3–14, 143:3–23.) Although Gross stated that his wife has lived in Israel for 30 years, that many of his children live in Israel, and that he spends about half of his time in Israel, Gross also established that he returns to the United States "at least once a month." (*See id.* at 144–46.) Nothing in the record indicates that Gross made an affirmative move to change his domicile from New York to Israel, and he has never stated an intent to remain in Israel indefinitely. *Shcherbakovskiy v. Seitz*, No. 03-CV-1220 (RPP), 2010 WL 1063566, at *2 (S.D.N.Y. Mar. 23, 2010). Taking into account the totality of the evidence, the Court concludes that at the time the complaint was filed, Gross was domiciled, and was therefore a citizen of, New York. *Gutierrez*, 966 F. Supp. at 217.

4.   *Defendant LLC Was a Citizen of New York*

Plaintiffs' complaints identify Defendant LLC as a New York limited liability company, which Defendant LLC admitted in its answer. (Compl., ECF No. 1, ¶ 3; Am. Compl., ECF No. 5, ¶ 5; Represented Defs.' Am. Answer, ECF No. 14, ¶ 3.) Plaintiffs' amended complaint alleges that Marla DiForte is a member of Defendant LLC. (Am. Compl., ECF No. 5, ¶ 55.) Plaintiffs also suggest that Gross and John DiForte are members of the LLC. (*Id.* ¶¶ 125, 133, 161.) On September 29, 2023, in response to an order to file a disclosure statement under the recently-amended Rule 7.1, Defendant LLC filed its statement, indicating that its sole member has been Marla DiForte since its

27

inception, and that its citizenship is and has always been New York. (Rule 7.1 Statement, ECF No. 155.) Absent any evidence to counter Defendant LLC's disclosure statement indicating its sole shareholder has always been a New York citizen, the Court concludes that Defendant LLC also was and is a citizen of New York.[17]

## II. Amount in Controversy

### A. Legal Standard

Diversity jurisdiction requires a "reasonable probability" that the amount in controversy exceeds $75,000, the minimum amount to give a district court jurisdiction. *Smulley v. Safeco Ins. Co. of Illinois*, No. 21-CV-2124, 2022 WL 16753118, at *1 (2d Cir. Nov. 8, 2022); *see also* 28 U.S.C. § 1332. "A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." *Scherer v. Equitable Life Assurance Soc'y of the U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (quotation marks omitted). There is a "rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Id.* (quotation marks omitted); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) ("The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that . . . the sum claimed by the plaintiff controls if the claim is apparently made in good faith." (footnote omitted)). A defendant can rebut this presumption by demonstrating "'to a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums.'" *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 223 (2d Cir. 2017) (quoting *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006)); *see also St. Paul Mercury Indem. Co.*, 303 U.S. at 289.

---

[17] Moreover, even if Gross and John DiForte are members of the LLC, they too are citizens of New York, as discussed *supra* note 6.

Additionally, where multiple plaintiffs assert separate claims, each plaintiff must allege damages of at least $75,000. *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 933 (2d Cir. 1998). Plaintiffs ordinarily cannot aggregate their claims against multiple defendants in order to meet the jurisdictional requirement. *Id.*[18]

"[I]f a court makes a face-of-the-complaint determination that the $75,000 amount in controversy cannot be recovered to a legal certainty, the case is dismissed for lack of subject matter jurisdiction." *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 507 n.5 (2d Cir. 2005) (quotation marks omitted); *see Capeci v. Seven Corners Inc.*, No. 22-CV-6644 (RPK) (PK), 2022 WL 17253527, at *1 (E.D.N.Y. Nov. 28, 2022); *St. Paul Mercury Indem. Co.*, 303 U.S. at 289 ("It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."). Accordingly, if the alleged amount

---

[18] The Court notes that if several plaintiffs are seeking to enforce a single title or right, in which they have a "common and undivided interest," their claims may be aggregated to reach the jurisdictional minimum. *Loc. 538 United Bhd. of Carpenters & Joiners of Am. v. U.S. Fid. & Guar. Co.*, 154 F.3d 52, 55 (2d Cir. 1998) (quotation marks omitted); *Zahn v. Int'l Paper Co.*, 414 U.S. 291, 294 (1973) ("[W]hen several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount."), *superseded by statute on other grounds as stated in Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005); *Burton v. Terrell*, 368 F. Supp. 553, 556 (W.D. Va. 1973) (analyzing the plaintiffs' amount in controversy as aggregated). However, aggregation of claims in federal diversity jurisdiction is a somewhat unsettled area of caselaw. *See* Wright & Miller, § 38 Aggregation of Separate Claims, 20 Fed. Prac. & Proc. Deskbook (2d ed. 2023) (citing cases) ("[I]t is not altogether easy to say what the law is in this area, and it is quite hard to say why it is as it seems to be."). Of relevance here, paradigmatic cases that have allowed aggregation of claims "are those which involve a single indivisible res, such as an estate, a piece of property (the classic example), or an insurance policy." *Gilman v. BHC Sec., Inc.*, 104 F.3d 1418, 1423 (2d Cir. 1997) (quotation marks omitted); *see also* Steven S. Gensler, *Diversity Class Actions, Common Relief, and the Rule of Individual Valuation*, 82 Or. L. Rev. 295, 335–36 (2003) ("[O]ne of the defining characteristics of 'tenancy in common' and 'joint tenancy' is unity of possession, whereby the co-owners 'share a single right to possession of the entire interest.'"); *id.* (explaining that, functionally, "when courts use the total value of jointly-held rights, they do so not by adding the value of each plaintiff's claim, but by giving each plaintiff full credit for his claims and not dividing that amount just because other persons independently can assert the same rights"). As discussed *infra*, Plaintiffs have asserted claims regarding the alleged deprivation of the right of first refusal as to shares of the Property, which claim exceeds the jurisdictional amount. Even though each Plaintiff is asserting that claim, it is not fair or logical to divide the value of that claim across the three Plaintiffs merely because all three of them assert it.

in controversy is premised on damages that are unavailable as a matter of law then those damages "may not be used to meet the diversity jurisdiction threshold." *Bracken v. MH Pillars Inc.*, 290 F. Supp. 3d 258, 268 (S.D.N.Y. 2017); *see, e.g., id.*; *Int'l Christian Broad., Inc. v. Koper*, No. 12-CV-3570 (LDW) (GRB), 2012 WL 5210595, at *3–4 (E.D.N.Y. Oct. 19, 2012), *report and recommendation adopted*, 928 F. Supp. 2d 559 (E.D.N.Y. 2013); *Z-Axis Tech Sols., Inc. v. Richmond Cap. Grp., LLC*, No. 17-CV-3983 (GBD), 2018 WL 1088008, at *3–4 (S.D.N.Y. Feb. 14, 2018). Further, "'in computing the jurisdictional amount, a claim for punitive damages is to be given closer scrutiny.'" *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 225 (2d Cir. 2017) (alterations omitted) (quoting *Zahn v. Int'l Paper Co.*, 469 F.2d 1033, 1033 n.1 (2d Cir. 1972), *aff'd*, 414 U.S. 291 (1973)).

## B.  Analysis

### 1.  *The Value of the Pool Property*

At the outset, the Court notes that no party submitted a formal appraisal of the Property. Plaintiffs' amended complaint list the property as valued at $518,000 (or $64,750 per 1/8th share). (Am. Compl., ECF No. 5, ¶¶ 44, 65.) At the hearing, Plaintiffs offered a "Notice of Property Value" from the N.Y.C. Department of Finance for the Property, indicating that the market value for the 2016–2017 tax year was $584,000 (or $73,000 for each 1/8th share). (App. 2; Tr., ECF No. 151, at 55–58.) Defendant Gross argued that the Property was sold at an auction in the state court tax foreclosure litigation in October 2019 for $250,000 (or $31,250 per 1/8th share), although that sale was not completed. (Gross Mem., ECF No. 129, at 20–21.) Ordinarily, in determining the fair market value of real property, courts would consider expert testimony from a property appraiser, but none was offered at this hearing. *See Manson v. Kejo Enterprises, LLC*, 44 N.Y.S.3d 167, 169 (N.Y. App. Div. 2d Dep't 2016). Based on the limited information available, and considering this Court's role in determining the amount in

30

controversy alleged, the Court finds the Pool Property was worth at least $584,000 (or $73,000 for each 1/8th share) at the time the case was filed, noting that tax foreclosure auctions frequently involve prices that fall below market value.

2. *Plaintiffs' Claims in the Second Amended Complaint*

As described above, the amended complaint alleges various causes of action, including fraud and civil conspiracy related to the fraudulent deeds; fraud, negligent misrepresentation, and conversion, related to Defendants' denying Plaintiffs their possessory rights in the Pool Property; spoliation of evidence;[19] unjust enrichment; abuse of process;[20] breach of fiduciary duty, based on Defendants' alleged self-dealing and personal conflicts of interest while in a "fiduciary relationship" with Plaintiffs by virtue of their alleged co-ownership of the Pool Property; breach of the implied covenant of good faith and fair dealing; slander of title, for making "one or more communications[ ]falsely casting doubt on the validity of the plaintiff[s'] title"; and seeking specific performance, requiring Defendants "to provide the Plaintiffs[] and each

---

[19] As to Plaintiffs' spoliation of evidence claim, the Court notes that Judge Bloom's report and recommendation concluded that the claim is not viable as a matter of law, as follows: "Courts in this circuit have applied the rationale of *Ortega v. City of New York*, 9 N.Y.3d 69 (2007) which held that a party may not seek to recover damages for discovery violations as a separate tort." (R. & R., ECF No. 85, at 10.) Accordingly, as a matter of law, it is unlikely that Plaintiffs can prevail on a spoliation of evidence claim related to the state court partition litigation.

[20] In New York, an "[a]buse of process [claim] has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (1984). Notably, "'claims for malicious prosecution and abuse of process do not accrue until the underlying action which is the basis for the claim is terminated in the plaintiff's favor by dismissal.'" *Kanciper v. Lato*, 989 F. Supp. 2d 216, 235 (E.D.N.Y. 2013) (quoting *TADCO Constr. Corp. v. Dormitory Auth. of NY*, 700 F. Supp. 2d 253, 273 (E.D.N.Y. 2010)). In light of the fact that the underlying state court litigations have not yet concluded, Plaintiffs' abuse of process claim has not yet accrued, as a matter of law, and the Court does not consider any alleged damages for this claim in its analysis.

of them with the right of first refusal contained in valid and enforceable deed covenants."[21] (Am. Compl., ECF No. 5, ¶¶ 170–224.)

Among other theories, Plaintiffs claim Defendants engaged in fraud with regard to three deeds, which scheme resulted in unlawful conversion, unjust enrichment, and a breach of Defendants' fiduciary duties insofar as Plaintiffs allege they were denied their right of first refusal to purchase at least three shares of the Pool Property. (*See* Am. Compl., ECF No. 5, ¶¶ 15–16, 116–17, 167–68; Tr., ECF No. 151, at 111:19–112:1.) "A right of first refusal entitles the holder to match any subsequent offers for the property before the third party offeror can complete its transaction." *In re Adelphia Commc'ns Corp.*, 368 B.R. 348, 353 (Bankr. S.D.N.Y. 2007); *see Cipriano v. Glen Cove Lodge No. 1458*, 1 N.Y.3d 53, 50 (2003) ("A right of first refusal is a right to receive an offer, and the grantor's failure or refusal to extend the holder the opportunity to exercise the right constitutes a breach."); *Peters v. Smolian*, 12 N.Y.S.3d 824, 833 (N.Y. Sup. Ct. 2015), *judgment entered*, (N.Y. Sup. Ct. 2015), *aff'd*, 63 N.Y.S.3d 436 (N.Y. App. Div. 2d Dep't 2017) (collecting cases, including *Cipriano*). Furthermore, "[s]pecific performance may be granted only where the holder of the right of first refusal is shown to be ready,

---

[21] Defendants dispute the merits of Plaintiffs' right of first refusal claim, arguing that: "On or about December 19, 2011, Plaintiff Agoliati, amongst others, were offered 4 shares of the pool property from the defendants . . . . The defendants were seeking to transfer their 4 shares to Block 865 Lot 300 LLC. Plaintiff Agoliati received the correspondence offering the shares for $12,800 ($3,200 per share)." (Represented Defs.' Mem., ECF No. 130, at 5.) Defendants allege that "Plaintiff Agoliati did not exercise his right to the purchase." (*Id.*) The Court notes that Plaintiff Agoliati submitted evidence suggesting property shares had been offered to the owners. (*See* Agoliati Exs., ECF No. 143, at ECF p. 23 ("John DiForte has made offers to buy all the shares, or sell his share to the membership. These offers are still active."); *id.* at ECF p. 34 ("This letter constitutes 15 days['] notice advising you of your right to buy any or all of these interests as an individual. We must be advised by you by mail, email, or fax no later than March 16, 2012 if you wish to buy. . . . We will sell to the first party ready to close after March 16.").) Plaintiff Grigoli also offered evidence related to offers to sell or buy. (*See* App. 1.) Here, however, the Court does not reach the merits of this claim (or whether there may be factual defenses to it) in evaluating whether Plaintiffs' amended complaint has alleged the requisite amount in controversy.

willing, and able to purchase the property, not only when the right ripens, but also when specific performance is ordered." *Cipriano,* 1 N.Y.3d at 61 (quotation marks omitted).

By engaging in the alleged fraud and conversion, Plaintiffs assert that Defendants deprived them of the opportunity to purchase at least three shares of the Pool Property. Assuming the Pool Property is valued at $584,000 total (or $73,000 for each 1/8th share), and multiplying that by the number of shares Plaintiffs could have obtained if their contractual right of first refusal been honored, Plaintiffs' amended complaint alleges an amount in controversy of $219,000 ($73,000 x 3) on that claim alone, exceeding the $75,000 threshold. Other claims also allege monetary injury, including the claims of Plaintiffs Piccone and Grigoli that their shares of the Pool Property, each with an approximate valuation of at least $73,000, were obtained by fraud. Accordingly, based on an evaluation of the claims set forth in the amended complaint, the Court does not find "to a legal certainty that the claim is really for less than the jurisdictional amount" so as to warrant dismissal on this basis. *St. Paul Mercury*, 303 U.S. at 289.

## CONCLUSION

Based on the above findings of fact and conclusions of law, the Court recommends finding as follows:

(1) Plaintiff Piccone was domiciled in Canada when he joined the lawsuit;

(2) Plaintiff Agoliati was domiciled in New Jersey and was a New Jersey citizen when this case was initiated;

(3) Defendant Gross was domiciled in New York and was a New York citizen when this case was initiated;

(4) Defendant LLC was a citizen of New York when this case was initiated; and

(5) Plaintiffs adequately allege an amount in controversy of at least $75,000.

In addition, because Plaintiff Piccone was domiciled in Canada, he was not a citizen of any state at the time he joined this case and his presence in the case destroys diversity jurisdiction.

\* \* \* \* \*

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *see also* Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, e.g.,* *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision" (quotation marks omitted)).

**SO ORDERED.**

Dated: Brooklyn, New York
        November 17, 2023

*Taryn A. Merkl*
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE

34

## Appendix 1: May 11, 2023 Evidentiary Hearing Exhibits

### I.  Plaintiff Chris Agoliati's Exhibits

Plaintiff Agoliati offered several exhibits that the Court admitted at the hearing, including the following. (Tr., ECF No. 151, at 6–64.)

1) Agoliati Exhibit 1 included (a) a photocopy of the front of his expired New Jersey's driver's license, indicating an address in Towaco, New Jersey, issued on April 3, 2018, with an expiration date of March 31, 2022; (b) a photocopy of the front of his current New Jersey driver's license, indicating an address in Montville, New Jersey, issued December 13, 2022, with an expiration date of November 3, 2026; (c) a photocopy of a page in his U.S. passport, issued March 16, 2022, with an expiration date of March 15, 2032, indicating his nationality as a U.S. citizen; (d) a photocopy of his Real Estate Broker license issued from New York, indicating his Montville, New Jersey address, issued on April 30, 2023, with an expiration date of April 29, 2025; and (e) a handwritten document listing his purported domiciles since 2010, and noting several of his recent jobs.

2) Agoliati Exhibit 2 included (a) a handwritten list of his purported income since August 11, 2022; (b) a photocopy of the front of a check for $3,465 from Dr. Edwin A. Turner Jr. and Jeanne C. Turner, dated January 17, 2023, with the note "Repairs – 300 St [illegible]" on the memo line; and (c) a photocopy of the front of another check, also from the Turners to Agoliati, for $2,972.23 for "300 Repairs."[1]

3) Agoliati Exhibit 3 included (a) a photocopy of the certificate of occupancy from the N.Y.C. Department of Buildings for the Property (block 865 lot 300), which was blurry and difficult to read; (b) a second, clearer photocopy of a different certificate of occupancy from the N.Y.C. Department of Buildings, classifying the property as a "residence" with "One (1) family residence" and an "[a]ccessory private swimming pool"; (c) a receipt from the N.Y.C. Department of Buildings for $5 dated June 25, 2009 (presumably related to the payment for the records); (d) a hand-annotated, undated, and unsigned purported map of the Property; (e) a second purported map of the property, similarly lacking identifying information as to the creator and date of creation; (f) an apparent property description, including covenants and restrictions, that has "865" handwritten in the left margin and no other address listed; and (g) an undated purported map with the words "Chapin Pond Park II" written on the top.

4) Agoliati Exhibit 4 consisted of (a) a photocopy of the front of an envelope, with the return address "The DiForte Agency, Inc., Since 1951, 1194 Hylan Blvd., Staten Island, N.Y. 10305-0004," addressed to Agoliati at a P.O. Box in Sea Girt, New Jersey, with a stamp from the U.S. Postal Service ("U.S.P.S.") dated 8/9/2012 indicating a postal payment of $0.00; (b) a typewritten letter entitled "Pool Property Annual Expenses 2012" addressed to Agoliati from McCarthy

---

[1] As to Agoliati Exhibit 2, the Court did not admit the first and last pages. (Tr., ECF No. 151, at 11, 16.)

and John DiForte, indicating an outstanding balance in 2012, and noting that "John DiForte has made offers to buy all the shares, or sell his share to the membership. These offers are still active."; (c) a photocopy of the front of a check from Agoliati to McCarthy for $1,169 for the outstanding balance, dated 9/27/2012, with the memo line "1/8 pool share" and a photocopy of an envelope from Agoliati to McCarthy with a stamp in the corner (with no indication that the stamp or envelope had been processed by the U.S.P.S.); and (d) a letter from Marla DiForte to Agoliati dated October 17, 2012, indicating an expense Agoliati owed regarding tree damage at the Pool Property, with a handwritten note on the bottom that says "10/17/12 pd. Check # 571 of CHASE ACCT # 6946."

5) Agoliati Exhibit 5 consisted of (a) a photocopy of the front of a check from Agoliati and Gail Lynn Lagomarsino, listing their address in Spring Lake, New Jersey, dated October 3, 2003, made out to McCarthy, for $300, with the memo line reading "BL865 LOT 300," with a handwritten note on the bottom of the photocopy reading "due May 1 2003 [illegible] April 30 2004"; (b) a photocopy of the front and back of a check from Agoliati and Lagomarsino to McCarthy, dated June 7, 2004, for $350, with the memo "BL 865 LOT 310 POOL MTN May 1 2004 – April 30 2005," signed by McCarthy on the back, with a stamp from the Bank of New York indicating the check had been cashed on June 14, 2004; (c) a document entitled "Pool Property Statement May 1 2004 – April 30 2005" (capitalization and punctuation altered) listing expenses, with McCarthy's name printed on the bottom and a handwritten note written in the corner ("BNY Ch# 2239 6/7/04"); (d) additional checks from Agoliati and Lagomarsino to McCarthy, including: (i) a check dated July 22, 2005, for $350 (front and back of the check, endorsed by McCarthy on the back and stamped by the Bank of New York), (ii) a check dated May 1, 2006, for $350 (front and back of the check, McCarthy's endorsement, and a bank stamp), (iii) a check dated May 1, 2007, for $350 (front only), (iv) a check dated April 23, 2008 for $425 (front only); and (v) a check dated November 9, 2009, for $50 (front only); (e) a photocopy of an envelope from Carmel McCarthy to Agoliati at his Sea Girt, New Jersey address, which appeared to have been stamped and processed by the U.S.P.S. on August 16, 2010; (f) an undated letter from Carmel McCarthy and John and Marla DiForte, setting a deadline of March 16, 2012, for the recipient to indicate whether they wanted to buy additional interests ("This letter constitutes 15 days notice advising you of your right to buy any or all of these interests as an individual. . . . We will sell to the first party ready to close after March 16."), listing the names and addresses of Jerome Grigoli, Richard Makarski, and Chris Agoliati at the bottom; (g) a two-page document entitled "April 2011–May 2012 Pool Statement," indicating "Five shares paid [for] Diforte, Baione, McCarthy (3)" and "Three shares not paid [for] Grigoli, Piccone, Agoliati (1/2)"; (h) another photocopy of the front of a check from Agoliati to McCarthy on September 27, 2012, for $1,169 with the memo line "1/8 pool share re taxes Bl 865 Lot 300," with a photocopy of an envelope from Agoliati (with his Sea Girt, New Jersey address listed) to McCarthy; and (i) a letter dated October 17, 2012, from the DiForte Agency, Inc. to Agoliati, signed by Marla DiForte, requesting payment related to tree damage that affected the Property, with a handwritten note at the bottom reading "10/17/12 Pd. CHECK # 571 of CHASE ACCT # 6946."

6) Agoliati Exhibit 7 was admitted in part; pages 1–3 and 10–12 were admitted into evidence, but the remainder was not. The admitted pages of Agoliati Exhibit 7 included (a) a photocopy of the front and back of a banker's check for $54,921.41 that reads "Re: PEGGY J. STOCK"[2] at the top, dated September 14, 2022, and endorsed on the back; (b) a photocopy of the front of a money order dated August 18, 1992, for $1,000, made payable to Leonard and Barbara Dusold; (c) a photocopy of the front of a cashier's check made out to Leonard and Barbara Dusold for $8,000, dated August 17, 1992; (d) a document entitled "To Share Owners of The Property Known as Block 865 Lot 300 SPECIAL ASSESSMENT," noting charges based on construction of a concrete block retaining wall at the Property; (e) a "Notice of Property Value" from the N.Y.C. Department of Finance for the Property, dated January 15, 2015, indicating the market value for the 2016–2017 tax year as $584,000; and (f) a receipt noting a $317 refund from the Richmond County Clerk, which Plaintiff Agoliati testified was related to his thwarted attempted to record his deed for his 1/8th share of the Property.

## II. Plaintiff Louis Piccone's Exhibits

Plaintiff Piccone offered several exhibits that the Court admitted at the hearing, including the following. (Tr., ECF No. 151, at 5–38.)

1) Piccone Exhibit 1 consisted of a deed dated July 1, 2005 for his Dalton, Massachusetts property, indicating the sale of the property to Louis A. Piccone and Elena Piccone, husband and wife.

2) Piccone Exhibit 2 consisted of Piccone's mortgage for his Dalton, Massachusetts property, dated July 1, 2005.

3) Piccone Exhibit 3 consisted of a printout from the Massachusetts Secretary of State website, printed on May 9, 2023, indicating his voting status as "active" and listing his Dalton, Massachusetts property address.

4) Piccone Exhibit 4 consisted of a photocopy of the front side of a Dalton Free Public Library card, with no identifying account number or cardholder name on it.

5) Piccone Exhibit 5 consisted of a printout from Mass.gov, indicating several suspensions of his Massachusetts driver's license.

---

[2] Agoliati testified that Peggy J. Stock is a business partner who helps with real estate transactions. (Tr., ECF No. 151, at 43–44.)

**Appendix 2: Notice of Property Value, N.Y.C. Department of Finance**



**NYC**
**Department of Finance**

# IMPORTANT INFORMATION
# ABOUT YOUR PROPERTY

## NOTICE OF PROPERTY VALUE

**\*417104816011501\***
**BLOCK 865 LOT 300 LLC**
**1184 HYLAN BLVD**
**STATEN ISLAND NY  10305-1920**

January 15, 2016
**OWNER NAME**
BLOCK 865 LOT 300 LLC
**PROPERTY ADDRESS**
HILLVIEW PLACE

| **BOROUGH** | **BLOCK** | **LOT** |
|---|---|---|
| STATEN ISLAND | 865 | 300 |

**TAX CLASS:** 1 *(Primarily one to three unit residential property)*
**BUILDING CLASS:** Z0 *(Miscellaneous)*
**UNITS:** 0 non-residential

**THIS IS NOT A BILL.** This notice gives you information about how the New York City Department of Finance values your property.

### Property Assessment

|  | Current Tax Year July 1, 2015 - June 30, 2016 | Change | Upcoming Tax Year July 1, 2016 - June 30, 2017 |
|---|---|---|---|
| Market Value | $567,000 | +$17,000 | $584,000 |
| Assessment Percentage | 6% |  | 6% |
| Assessed Value | $17,140 | +$969 | $18,109 |
| Effective Market Value | – | – | $301,816 |
| Exemption Value | $0 | +$0 | $0 |
| Taxable Value | $17,140 | +$969 | $18,109 |

Exemption:  None

### Definitions

**Market Value** is the estimated value for 1-3 family homes based on recent comparable sales.

**Assessment Percentage** is a fixed percentage of Market Value that is set by law.  For class 1 properties, it is 6%.

**Assessed Value (AV)** is calculated by multiplying your Market Value by the Assessment Percentage. A cap on AV imposed by New York State law can affect your Assessed Value.  Your AV cannot increase more than 6% a year or 20% over five years unless you have made a physical change to your building.

**Effective Market Value** is calculated by dividing the AV by the Assessment Percentage.  Your Effective Market Value of $301,816 is calculated by taking the AV of $18,109 and dividing it by 6% (.06).

**Exemption Value** is the amount of property tax benefits you currently have (except for abatements, which are not listed above but are listed on your property tax bills).  This value is subject to change.  If you recently applied for exemptions, they may not be listed.  If you would like to apply for any personal homeowner exemptions, please submit your application by March 16, 2016.   Other exemptions have different deadlines.  For more information about exemptions, visit nyc.gov/ownerexemption or contact 311.

**Taxable Value** is the Assessed Value minus the Exemption Value.

**Estimate your property taxes** for 2016/17 by multiplying your Taxable Value by the current tax rate, and then subtract abatements. The result will be an estimate of your property taxes for 2016/17.

### Important Information

- You may challenge your property value.  Please read more about how to challenge your property values on the "What is Your Notice of Property Value (NOPV)" sheet that is included in this mailing.
- If you have tried to resolve an issue through normal Department of Finance channels and feel it has not been settled, you may contact the Taxpayer Advocate at:  www.nyc.gov/taxpayeradvocate, or by calling 311.